Francis S. LEVIEN, Plaintiff,

v.

SINCLAIR OIL CORPORATION and Sinclair Venezuelan Oil Company, Defendants.

Court of Chancery of Delaware, New Castle.

Dec. 23, 1969.

Richard F. Corroon and Robert K. Payson, of Potter, Anderson & Corroon, Wilmington, Seligson & Morris, J. Lincoln Morris and Edward S. Cowen, Pollack, Greenspoon & Singer, New York City, of counsel, for plaintiff.

Henry M. Canby, of Richards, Layton & Finger, Wilmington, George G. Gallantz, Richard I. Goldsmith, Michael A. Bamberger, Howard L. Ganz, of Proskauer, Rose, Goetz & Mendelsohn, and Vincent A. Gorman, New York City, of counsel, for defendant Sinclair Oil Corp.

Robert W. Wakefield, of Walker, Miller & Wakefield, Wilmington, Leon H. Tykulsker, of Guggenheimer & Untermeyer, New York City, for defendant Sinclair Venezuelan Oil Co.

DUFFY, Chancellor:

This is a derivative action brought by Francis S. Levien, a stockholder of Sinclair Venezuelan Oil Company, a Delaware corporation ("Venezuelan") against Sinclair Oil Corporation, a New York corporation ("Sinclair"). This is the decision after trial limited to the liability issue.[1]

I

Sinclair owns about 97% of Venezuelan's issued and outstanding stock. The remainder, totaling some 120,000 shares, is publicly held and traded on the American Stock Exchange. Levien owns about 3,000 of those shares which he bought on April 19, 1960.

Venezuelan was incorporated in 1922 and since then has been engaged in petroleum operations in Venezuela. It explored and developed concessions for oil and gas, and after 1950 those operations were supplemented by refining and deep water terminal facilities at Puerto de la Cruz. In times past the Company had interest in oil and gas leases in Texas and in Panama but

1. Over Sinclair's objection plaintiff's motion for separate trials on liability and damages (accounting) was granted. Compare Auerbach v. Cities Service Company, 37 Del.Ch. 381, 143 A.2d 904 (1958), 70 A.L.R.2d 1298.

since 1959, at least, it has operated only in Venezuela. Sinclair, of course, is also in the business of exploring for oil and of producing and marketing crude oil and oil products. It functions as an international oil enterprise in the production, transportation, refining and marketing of petroleum and its products throughout the world.

In 1940 Sinclair owned 52.13% of Venezuelan's outstanding shares. By 1955 those holdings had increased to about 86% and when Levien bought his stock Sinclair held something over 96% of the shares.

Plaintiff's case is grounded upon the premise that at pertinent times all directors and officers of Venezuelan were "saturated" with conflicts of interest because of their employment by or subservience to Sinclair to whom Venezuelan sold substantially all of its crude oil and oil products. Plaintiff contends that Sinclair dominated and controlled Venezuelan and exercised its power in such a way ("overreached") as to damage the Corporation and, in particular, the interest of its public (minority) stockholders. Specifically, he charges Sinclair with waste, mismanagement and the violation of\ fiduciary duties.

Sinclair denies that there is any basis for liability in fact or in legal consequence. It asserts that its entire relationship with Venezuelan was characterized by a generosity which resulted in more than mere fairness to the minority stockholders.

## II

■ Sinclair's majority control of Venezuelan has been implemented by nomination of all members of its Board of Directors (at all pertinent times). Those directors were, without significant exception, persons who were officers, directors or employees of

other corporations in the Sinclair complex. At trial there was much evidence about the many corporate offices such directors held in Sinclair affiliates but there is no value in repeating the details here. The point is, and I find as a fact, that at all relevant times the Venezuelan directors were not "independent" of Sinclair. They were not in a position to make judgments as to what was in Venezuelan's best interest, alone, without regard to Sinclair's other operations, and it would be surprising if they were. I say this because Venezuelan was regarded as part of an integrated company, according to the testimony of Edward L. Steiniger, the chief executive officer of Sinclair from 1961 to 1968.[2] And the chief executive of Sinclair selected or approved the directors and officers of subsidiaries, including Venezuelan. Given the domination which the selection of directors and officers effected, Sinclair's duty to Venezuelan is that of a fiduciary. And Sinclair concedes this.

■ Sinclair's relationship with Venezuelan is thus to be examined and tested by fiduciary standards. And those invoke notions of good faith, fair dealing, and the like. The principles and precepts defining what is meant by fiduciary duty are well established in our law. Thus the Supreme Court said of such a duty in the landmark case of Guth v. Loft, Inc., 23 Del.Ch. 255, 5 A.2d 503 (1939):

"Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests. While technically not trustees, they stand in a fiduciary relation to the corporation and its stockholders. A public policy, existing through the years, and derived from a profound knowledge of human characteristics and

2. Mr. Steiniger testified:
 "The general policy was to treat it [Venezuelan] as part of an integrated organization with a quite liberal autonomy in conducting its affairs but fitting into where it could obtain the best benefits accruing to a larger organization that would have access to crudes

from various countries in larger volumes that would more readily be exchangeable in case of sale, and when one particular crude would not be available, it might exchange for another and switch these crudes of one country around with another crude to facilitate such sale and exchange. * * *"

motives, has established a rule that demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability might properly bring to it, or to enable it to make in the reasonable and lawful exercise of its powers. The rule that requires an undivided and unselfish loyalty to the corporation demands that there shall be no conflict between duty and self-interest."

In practical application this means that:

" * * * [W]hen the persons, be they stockholders or directors, who control the making of a transaction and the fixing of its terms, are on both sides, then the presumption and deference to sound business judgment are no longer present. Intrinsic fairness, tested by all relevant standards, is then the criterion."

David J. Greene & Co. v. Dunhill International, Inc., Del.Ch., 249 A.2d 427 (1969). Compare Gottlieb v. Heyden Chemical Corp., 33 Del.Ch. 82, 90 A.2d 660 (1952); Allied Chemical and Dye Corp. v. Steel and Tube Co. of America, 14 Del.Ch. 1, 120 A. 486 (1923).

■ And when those principles become applicable the necessary corollary, based upon the Supreme Court's opinion in Sterling v. Mayflower Hotel Corp., 33 Del.Ch. 293, 93 A.2d 107, 38 A.L.R.2d 425 (1952), is that the party owing the fiduciary duty has the burden of showing fairness. In short, as in *Dunhill,* supra, Sinclair (a) has the burden of proof, (b) to show that its transactions with Venezuelan were fair, (c) after a careful scrutiny by the Court.

Sinclair argues that the nature and extent of the fiduciary duty depends upon the circumstances of the case. Of course it does; but that simply means that the result is not known until the law is applied to the facts.

Sinclair argues also that the law does not bar interlocking directorates or control of one corporation by another. 8 Del.C. § 144(a) (3).[3] It does not, of course, but the issue is not whether there may be interlocking directorates or control by one corporation over another. The question is, rather, what duty arises where there are such directors and/or control.

■ As to directors, dual or multiple directorships are permissible and a person who is a director of a parent and of a subsidiary owes the same duty of good management to both, Warshaw v. Calhoun, Del.Ch., 221 A.2d 487 (1966); but this does not mean that an additional directorship is a device for diluting fiduciary duties. If it were, that would be, to state it mildly, a turnabout under our law.

But control is the key issue here. We are not concerned with directors having dual and/or conflicting duties. The question is not how a director of Venezuelan met his obligations to that company and to Sinclair. No such director is a defendant here. And we are not concerned with

---

3. 8 Del.C. § 144(a) (3) states:
 "(a) No contract or transaction between a corporation and one or more of its directors * * *, or between a corporation and any other corporation, * * * in which one or more of its directors * * * are directors * * *, shall be void or voidable solely for this reason, * * *, if:

* * * * *

"(3) The contract or transaction is fair as to the corporation as of the time it is authorized, approved or ratified, by the board of directors, a committee thereof, or the shareholders."

Sinclair's duty to its own stockholders. Whatever that duty, both the statute 8 Del. C. § 144(a) (3) and the cases require that Sinclair's contracts and transactions with Venezuelan be "fair."

Sinclair then argues that the fairness of the manner in which it "treated Venezuelan should be evaluated in terms of the treatment that minority stockholders like plaintiff could reasonably have expected the corporation to receive". See, Corporate Fiduciary Doctrine in the Context of Parent-Subsidiary Relations, 74 Yale L.J. 338, 349 (1964). That would take into consideration, says Sinclair, the "realities" of the parent-subsidiary relationship.

■ I have set out in a footnote the knowledge which Sinclair would charge to plaintiff (and, presumably to other stockholders similarly situated).[4] It is offered without persuasive authority and, in my judgment, it is also made without reason, because it (a) ignores the fact that the suit is for the benefit of the *corporation,* and (b) carried to its logical conclusion would mean that notice of (bad) conduct, not the conduct itself would be the criterion for recovery. A theory of "reasonable expectations" may have a place in the ebb and flow of corporate life as it relates to investment, market appraisals, and the like. But it would go against the grain of our decisions to apply it in derogation of duties we have so long regarded as fiduciary.

■ As Sinclair says, this Court has recently found the "arms-length" test unsatisfactory in a parent-subsidiary context. Meyerson v. El Paso Natural Gas Company, Del.Ch., 246 A.2d 789 (1967). It seems to me that objective fairness, Sterling v. Mayflower Hotel Corp., supra, is the appropriate test that should govern and I believe that to be what our courts have regularly applied in similar circumstances. Cf. Getty Oil Company v. Skelly Oil Company, Del.Ch., 255 A.2d 717 (1969). In sum, then, the evidence as to specific transactions is to be examined for the purpose of determining whether Sinclair carried the burden of proof and showed, after careful judicial scrutiny, that its transactions with Venezuelan were fair.

### III

I turn now to specific transactions which plaintiff says were unfair to Venezuelan.

### A.

I first consider dividends. From 1960 through 1966 Venezuelan paid $108,000,000 in dividends, which was about $38,000,000 more than its earnings during the period. There is no significant dispute about what

---

4. "Thus, in addition to the information available from a reading of Venezuelan's Certificate [authorizing contracts with corporations in which Venezuelan directors have an interest], plaintiff (as well as any minority stockholder) should have been aware that, aside from two isolated and unsuccessful instances before World War II, Venezuelan had functioned only in Venezuela. He should have been aware that it had been Sinclair's long-standing policy to have a separate subsidiary handle the investments made in each separate country. (See PX 35, 36). He should have been aware that Venezuelan did not necessarily intend to follow the announced dividend policy of its parent. (See PX 46, p. 1.) He should have been aware that it was Venezuelan's policy to relinquish concession acreage that, after study, 'did not appear to warrant additional exploratory drilling.' (PX 46, p. 2.) He should have been aware of the reorganization intended to qualify Venezuelan as a Western Hemisphere Corporation PX 86, p. 2), and he should have been aware of the adverse market conditions prompting Venezuelan to do an ever-increasing volume of business with affiliated companies (DX 49, p. 22; PX 45, 46). In none of these areas can it be said that plaintiff obtained any less than what *he* bargained for in April 1960."

dividends were paid and when.[5] The issue is drawn over why the dividends were paid and the conclusions to be drawn therefrom. Plaintiff charges that they amount to waste.

▮ The statute permits dividends to be paid under certain circumstances: "directors may declare and pay dividends * * * out of * * * surplus * * * or * * * net profits." [6] Whether dividends will be paid is within the sound discretion of the directors and, in the ordinary course of events, they are entitled to a presumption of good faith and inspiration by a bona fides of purpose. But given the special circumstances which obtain here (including Sinclair's fiduciary obligation combined with the impact which payment of those dividends had on stockholder equity) and the law which I have already stated, Sinclair has the burden of showing that declaration and payment of the dividends were fair to Venezuelan after careful scrutiny by the Court.

▮ Sinclair argues that the dividends were completely lawful under the statute, particularly because Venezuelan was a wasting asset corporation and the payments did not impair capital of the corporation.[7] But the statute does not require that dividends be paid. It merely permits payment. And it does not provide the insulating shield which Sinclair argues. As I have said, in the ordinary case the combination of the statute and deference to business judgment exercised by directors ends the matter. Here, however, we deal with payment of enormous sums to a stockholder-fiduciary at a time when the latter had need for large amounts of cash. Under these circumstances Sinclair must show more than just the statute. In other words, the statute is not legally conclusive on the dividend question; the statute is not a complete defense to the charge of waste.

Next Sinclair argues that sound business reasons supported the decisions to make the payments. It says that Venezuelan's dividend policy was essentially the same as that of other oil companies operating in Venezuela. But I do not find the evidence which supports this argument. Sinclair's evidence includes statistics as to all "trans-

5. Venezuelan's income and dividends were as follows:

| Year | Net Income | Dividends Paid |
|------|-----------|----------------|
| 1958 | $16,540,588 | $ 6,000,000 |
| 1959 | 10,289,572 | 8,000,000 |
| 1960 | 12,784,407 | 8,000,000 |
| 1961 | 11,355,730 | 10,000,000 |
| 1962 | 12,249,972 | 24,000,000 |
| 1963 | 10,589,910 | 28,000,000 |
| 1964 | 9,135,018 | 16,000,000 |
| 1965 | 6,760,736 | 12,000,000 |
| 1966 | 7,272,952 | 10,000,000 |

6. 8 Del.C. § 170(a) provides in part:

"The directors of every corporation, subject to any restrictions contained in its certificate of incorporation, may declare and pay dividends upon the shares of its capital stock either (1) out of its surplus, * * *, or (2) in case there shall be no such surplus, out of its net profits for the fiscal year in which the dividend is declared and/or the preceding fiscal year."

7. 8 Del.C. § 170(b) provides in part:
"Subject to any restrictions contained in its certificate of incorporation, the directors of any corporation engaged in the exploitation of wasting assets * * * may determine the net profits derived from the exploitation of such wasting assets or the net proceeds derived from such liquidation without taking into consideration the depletion of such assets resulting from lapse of time, consumption, liquidation or exploitation of such assets."

fers" abroad (out of Venezuela), not dividends alone, and that data is not helpful here. And as to Creole Petroleum Company, which is 90% or more owned by Standard Oil of New Jersey, comparison with its experience shows that Creole's dividends were relatively constant [8] while stockholder equity increased more than 20%. During the same period Venezuelan's dividends went up substantially while its earnings went down and stockholder equity dropped by about 45%.[9] In short, Sinclair has not shown by this evidence that its operations were consistent with experience in the Venezuelan oil industry.

Sinclair also contends that the possibility of a (Venezuelan) dividend tax and the repatriation of funds were important reasons for the dividend policy it followed. But neither the contemporary literature nor the minutes of director or other meetings refers to this rationale. Coming as they do now, these arguments now seem offered to suit the facts; I am not persuaded that they were relied on in making them. Cf. Young v. Janas, 34 Del.Ch. 287, 103 A.2d 299 (1954).

In brief, to this point I find that Sinclair has not met its burden of showing that its action in causing payment of the dividends is fully protected by statute or that such payments were consistent with industry practice in Venezuela. In short, Sinclair has failed to show that waste did not occur in law or fact.

### B.

I now turn to an argument originally advanced by plaintiff in terms of "opportunities" taken by Sinclair in Alaska, Canada, Paraguay, Algeria, Somalia and other places around the world. He said that these were all opportunities of Venezuelan and could have been taken by it. In "particular" plaintiff complained of Venezuelan's failure to acquire Drilling and Exploration Company, Inc., Western

8. A comparison of the two companies shows:

| | Venezuelan | | Creole | |
| --- | --- | --- | --- | --- |
| | Earnings | Dividends | Earnings | Dividends |
| Year | Per Share | Per Share | Per Share | Per Share |
| 1957 | $2.51 | $—— | $5.11 | $4.00 |
| 1958 | 4.13 | 1.50 | 3.04 | 3.60 |
| 1959 | 2.57 | 2.00 | 2.58 | 2.60 |
| 1960 | 3.19 | 2.00 | 2.64 | 3.25 |
| 1961 | 2.83 | 2.50 | 3.11 | 3.10 |
| 1962 | 3.06 | 6.00 | 3.08 | 3.05 |
| 1963 | 2.64 | 7.00 | 3.28 | 3.30 |
| 1964 | 2.28 | 4.00 | 2.93 | 3.30 |
| 1965 | 1.69 | 3.00 | 2.84 | 3.30 |
| 1966 | 1.81 | 2.50 | 2.68 | 3.30 |
| 1967 | 1.92 | 2.00 | 2.78 | 3.30 |

9. The impact of the dividends on stockholder equity is shown by the following tabulation:

| | Venezuelan | |
| --- | --- | --- |
| Year | Equity per share | Capital Expenditures |
| 1958 | $21.22 | $17,390,000 |
| 1959 | 21.80 | 9,617,000 |
| 1960 | 22.99 | 3,610,000 |
| 1961 | 23.33 | 3,183,000 |
| 1962 | 20.39 | 3,064,000 |
| 1963 | 16.04 | 1,108,000 |
| 1964 | 14.32 | 622,000 |
| 1965 | 13.01 | 604,000 |
| 1966 | 12.33 | 9,178,000 |

Natural Gas Company and other properties taken on by Sinclair during the years under consideration. But Sinclair's brief was helpful in showing that plaintiff's argument here was out of the mainstream of the corporate opportunity cases, cf. Guth v. Loft, Inc., supra, and then plaintiff so conceded by framing his contention as follows: "Venezuelan was prevented from expanding, it was prevented from seeking out new sources of revenue, and it was denied the fundamental opportunity of industrial development." Logically, it seems to me, this contention is a companion piece to plaintiff's attack upon the dividends.

Sinclair says that it was not under a duty to offer any alleged opportunity to Venezuelan, that directors of a controlling parent must be afforded discretion to decide the manner in which opportunities presented to the enterprise should be allocated (when all are in the same line of business and the opportunity was not developed by or offered to a specific subsidiary) and it relies upon Johnston v. Greene, 35 Del.Ch. 479, 121 A.2d 919 (1956) and Burg v. Horn, 380 F.2d 897 (2 Cir. 1967) (which applies New York law and follows *Johnston*).

■ As abstract principles these propositions may be sound and, of course, whatever law the Supreme Court laid down in *Johnston* is binding here. And in applying the principles I agree that the Court should be aware that we are dealing with an international enterprise with a multiple and complex system of corporate affiliates. But we have not, as yet at least, divided our standards according to size. The quality of the duty is not strained, it is single and so falls the same on all corporations similarly situated, without regard to assets, sales or profits.

Sinclair voluntarily took on a fiduciary duty. To meet that obligation it could have installed a truly independent board and had it done so the business judgment test might have been dispositive of most of this case. But Sinclair elected not to do that. Looking past form, then, we find

Sinclair determining what policies Venezuelan was to follow. And that brings into focus, again, the test similarly "applicable to a transaction between the dominating director and his corporation—the test of fairness." Johnston v. Greene, supra; cf. Greene v. Dunhill, supra. See also Case v. New York Central Railroad Company, 15 N.Y.2d 150, 256 N.Y.S.2d 607, 204 N.E. 2d 643 (1965) in which the Court of Appeals said:

"Exercising, as it did by its majority stock ownership, effective control over Mahoning's affairs, Central was required to follow a course of fair dealing toward minority holders in the way it managed the corporation's business. It could not use its power to gain undue advantage to itself at the expense of the minority."

What, then, did Sinclair cause Venezuelan to do in the years 1960 through 1966? Was the subsidiary in fact denied industrial development and, if so, was that a course of dealing fairly under the circumstances?

The undisputed facts show that from 1960 through 1966 Venezuelan paid out $108,000,000 in dividends ($38,000,000 more than it earned), stockholder equity dropped from $22.99 per share to $12.33, and capital expenditures dropped from a $3,000,000 annual level to a low of $604,000 in 1965. Acreage was surrendered, no more was acquired and the company did not undertake any significant new activity.

This is the picture of a company in partial liquidation.

The picture, too, is in vivid contrast with the corporate policy which Sinclair announced and followed during the same period. Led by Mr. Steiniger, Sinclair embarked in 1962 upon a three-point program of cutting costs, increasing earnings "from every available source," and creating "new sources of revenue." And it was apparently successful. Acquisitions were made, revenues went from about 1.2 billion dollars in 1962 to about 1.4 billion dollars in 1966, and net profits more than doubled.

A reasonable inference is that much of this aggressive program which Sinclair undertook was implemented through subsidiaries. But not through Venezuelan. The "vigor" with which management implemented the company-wide program was singularly absent from the lone subsidiary with minority stockholders.

In the Venezuelan annual reports for the years 1958 through 1967 there is not a word about expansion, development, increasing earnings, creating new sources of revenue, liquidation, partial liquidation, wasting assets, or the like. There are statements about the special dividends; the 1962 report, for example, states:

"In declaring the special Dividend your Board of Directors considered: that the Company had no funded debt, no further concessions were to be granted by Venezuela, exploration and development possibilities were relatively modest and that the Company's cash position would continue to be sufficient to meet anticipated future needs."

The premises thus stated are accurate, so far as they go. As I have already noted, nothing was said about repatriation of funds, taxes or the like. And the same is true of directors and stockholders meetings for the same period. The minutes reflect only the most perfunctory kind of action in approving extra dividends: "recommended by management" is the euphemism to explain them. There is no recorded discussion of company prospects, the impact of government limitations, the opportunity for new ventures, discussion or reports of industrial or any other kind of development. There is little or nothing about declining sales, revenues, growth.

Sinclair offered evidence to show that "efforts" were made to expand in and out of Venezuela: development of a fish cannery, financing of low-cost housing, the purchase of a refinery in Newfoundland, and so on. But they are not persuasive. Indeed the minutes of directors meetings clearly show that the purchase of Venezuelan housing bonds (and treasury bills)

was made not on company initiative but on "request" of the government to all major oil companies operating in Venezuela. In short, Sinclair's evidence as to expansion and development efforts does not carry conviction. Explanations by the witnesses were meager, explorations by the Company were shallow at best. I find as a fact that Venezuelan made no real effort to expand or to develop industrially. And the absence of such effort is relevant in determining fairness in parent-subsidiary transactions in this case.

### C.

It seems to me that these two facets of the case, extraordinary dividends and the absence of any serious efforts to expand or develop industrially when considered together, are significant in showing how Sinclair managed Venezuelan's business. As to the first of these, the overwhelming inferences from the record are, and I so find as facts, that (a) the dividend payments coincided with Sinclair's substantial needs for large amounts of cash (Sinclair received 97% of the distributions), and (b) Sinclair's need for cash was the dominant factor in the decision to pay the dividends, particularly in 1963. There is indeed little to show that Venezuelan's corporate needs were weighed in the process. Dividends were first paid only when Sinclair could receive them tax-free, and thereafter the amounts were irregular because they were almost a function of Sinclair's need for cash. For example: in 1963 Venezuelan paid $28,000,000 against earnings of about $10,590,000, and in that year Sinclair borrowed $150,000,000. And the irregular payment schedule was substantially inconsistent with Sinclair's own announced and conservative approach (up to 50% of earnings) to dividends.

As to the absence of serious expansion or development efforts, the withdrawal of such enormous amounts of cash obviously had an impact on what the Company could do. I recognize that Venezuelan was in something of a bind (as were all oil companies in Venezuela) with limited acreage and no opportunity to acquire more. But

Sinclair's response to that challenge was to drain off corporate cash (which it needed) and to limit corporate development. I do not mean to say that Sinclair was under a duty to offer any specific opportunity to Venezuelan (although during the period in question Sinclair made acquisitions and expanded generally through ventures which were prima facie suitable for Venezuelan). I say only that it was obliged to follow a course of fair dealing toward the minority stockholders in the way it managed the corporation's business. Case v. New York Central Railroad Company, supra.

 I find that Venezuelan was not treated fairly because of the extraordinary and large cash withdrawals combined with the absence of any serious effort to add to revenue or to use corporate resources available for that purpose. The result was a drying up of the subsidiary and the only reasonable conclusion is that this was done because it was in the interest of Sinclair to do so. It was not in Venezuelan's.

When these two critical facts are laid side by side they make out a case for an accounting. I am aware that it takes an unusual case to override director judgment on dividends. But when such distributions are prompted by the needs of the fiduciary stockholder and when they dilute equity as they did here, and when they are combined with the absence of any serious effort to develop the company, then the conclusion is inevitable that the fiduciary has failed to apply the corporation's assets for the benefit of *all* stockholders. I think that the rule of *Guth* protects the minority stockholders in what otherwise would certainly be a precarious position.

 Dividends paid between 1960 and 1966 are those under attack by plaintiff and they are the basis of the ruling made herein. But I cannot say at this point that payment of *all* such dividends (in combination with other factors in the case) violated Sinclair's duty. However, I do say that Sinclair has not met its burden of showing that *payment of all* such dividends was consistent with its duty to Venezuelan, whether

or not that Company is regarded as a wasting asset corporation. Issue was joined by the parties on this all-or-nothing basis; hence counsel have not briefed the question of where "reasonable" dividends end and waste begins. To the extent that question is material, it will be a matter of further proceedings. It is, however, the ruling of the Court that Sinclair has a duty to account to Venezuelan for such damages as the latter sustained as a result of dividends declared and paid between 1960 and 1966, inclusive, and denial of industrial development during the same period.

IV

I turn now to plaintiff's arguments that Sinclair seized for itself a corporate opportunity in Colombia in derogation of its duty to Venezuelan. That opportunity was to explore and drill for oil and to engage in related activities.

 Prior to trial I ruled on the record as it then was that plaintiff lacked standing to complain because he was not a stockholder at the time of the pertinent transaction. Plaintiff became a stockholder of Venezuelan on April 19, 1960. Sinclair formed Sinclair Colombian Company (Colombian) on March 18, 1959, and when the motion was submitted the record showed that all Sinclair entries into Colombian operations were through 1959 agreements. Plaintiff argues that the record now calls for a different ruling.

On September 18, 1958 Sinclair and British Petroleum Co., Ltd., (BP) agreed to a memorandum which contemplated but did not bind either company to joint undertakings on a 50/50 basis "primarily but not exclusively in Latin America." Under the aegis of that agreement Sinclair has since March 1959 undertaken with BP and through Colombian three joint ventures. The first of these (Remolino Block) was under a Farmout and Joint Operating Agreement dated June 24, 1959, before Levien bought his stock. The second agreement involved the Provincia Venture and it was made on April 28, 1960. The third

agreement, the Cachira Farmout and Joint Operating Agreement, followed on November 15, 1960.

8 Del.C. § 327 provides:

"In any derivative suit instituted by a stockholder of a corporation, it shall be averred in the complaint that the plaintiff was a stockholder of the corporation at the time of the transaction of which he complains or that his stock thereafter devolved upon him by operation of law."

The key question is: What is the "transaction of which * * * [plaintiff] complains" and when did it take place?

Since oil was not available or known to exist in commercial quantities until after April 1960, plaintiff argues that the corporate opportunity in Colombia did not exist until after he became a stockholder. He says that the appropriation by Sinclair of oil in commercial quantities is the transaction of which he complains and this occurred after he became a stockholder. And, specifically, he says that the Provincia and Cachira Ventures "were corporate opportunities which plaintiff is entitled to pursue on behalf of Venezuelan." It is the evidence as to these two ventures on which plaintiff relies to take the claim out of the pretrial ruling.

As I have previously written, I regard Newkirk v. W. J. Rainey, Inc., 31 Del.Ch. 433, 76 A.2d 121 (1950), as precedent for deciding the question. And my view is unchanged. In that case the Court held that it was the stock purchases which were the wrongful acts that plaintiff sought to remedy and not the events which followed or flowed from the stock purchase. Chancellor Seitz wrote:

"Although a conspiracy culminating in the 1948 merger is alleged, the fact is that plaintiffs complain of and seek relief with respect to three specific transactions. They involve three stock purchases in the years 1944 and 1945. Those purchases in my opinion are the transactions in the sense in which the term 'trans-

action' is employed in Sec. 51A. I say this because they are the wrongful acts which plaintiffs want remedied and which are susceptible of being remedied in a legal tribunal. The allegation of a conspiracy cannot obscure the hard fact that the stock purchases are the wrongs which plaintiffs want rectified. Once it is decided, and I so decide, that the stock purchases are the 'transactions' of which plaintiffs complain, it almost necessarily follows under the undisputed facts that such transactions were consummated prior to the date plaintiffs acquired their stock.

And so it is here. The discovery of oil and availability of it to Colombian became possible only as a consequence of 1959 acts. Sinclair disposed of or transferred whatever corporate opportunity there was at that time when it elected to make and did make the decision to incorporate Colombian and use it as the vehicle for the company's operations in the State of Colombia. That is the fundamental basis which underlies the complaint, that is the "transaction" under attack. What followed merely implemented the 1959 action. Thus Sinclair Colombian is the party to the Provincia and Cachira agreements. While this is not necessarily controlling it does bring into focus the "transaction" requirement of the statute as it relates to plaintiff's contentions. In short, I regard the organization of a specific subsidiary (Colombian) under a specific agreement (with BP) for the purpose of engaging in oil operations in a specific country (Colombia) as the transaction under attack and capable of correction, when the record shows no entry into or activity in that country by the parent except through the subsidiary.

Plaintiff's reliance upon Maclary v. Pleasant Hills, Inc., 35 Del.Ch. 39, 109 A.2d 830 (1954) is misplaced. That case involved factors completely different from those which are here, and the result there was clearly necessary to prevent a corporation from using the statute to take advantage of its own delinquency.

As to Lavine v. Gulf Coast Leaseholds, Inc., 35 Del.Ch. 539, 122 A.2d 550 (1956), the Court found as a fact that the exchange offer specifically required stockholder approval and that was not given until after plaintiff acquired his shares. And, for present purposes, Guth v. Loft, Inc., supra, relates to what is a corporate opportunity and not when it is acquired.

I conclude that Levien lacks standing to complain that Sinclair seized an opportunity in Colombia which rightly belongs to Venezuelan.

V

Prior to October 1961 Venezuelan marketed crude oil and oil products throughout the world, including direct sales to Sinclair Refining Company ("Refining"), a wholly-owned subsidiary of Sinclair. Sales were made at posted prices, f. o. b. Venezuelan loading port, without discount.[10]

In July 1961 Sinclair incorporated another wholly-owned subsidiary, Sinclair International Oil Company ("International"), for the purpose of coordinating all of its foreign operations. All crude purchases by Sinclair were to be made thereafter through International. Clearly, this decision was made to benefit the Sinclair complex generally and any benefit to Venezuelan was incidental to that objective. But this is not to say that Sinclair used International as a vehicle to damage Venezuelan. Its objective, rather, was to improve overall operations and to that end International was conceived as a service agency, not for self profit-making purposes, but to develop a market for Sinclair products.

On September 28, 1961 Sinclair caused Venezuelan to contract with International whereby the former agreed to sell all of its crude oil and refined products to International at specified prices. International was obliged to purchase 10,950,000 barrels of crude oil per year plus or minus 20% at posted Venezuelan prices.[11] The contract covers unfinished naptha, No. 2 fuel oil, virgin gas oil, residual fuel oil (Bunker "C"). Both minimum and maximum quantities are thus specified as are prices and shipping terms. The contract price for crude oil was Venezuelan's posted price, f. o. b. Venezuela, less 5% (discount) and for refined products the same terms less 10%. Payment was called for "in United States dollars upon receipt by Buyer of Seller's Invoice."

I find that the agreement and its several amendments were not "negotiated," at least in the arms-length sense, and I do not understand Sinclair to argue to the contrary. Accordingly, the contract and transactions pursuant to it are subject to the fairness test. Sterling v. Mayflower Hotel Corporation, supra.

A.

Plaintiff makes several arguments about the contract. First, he attacks it as made in violation of Sinclair's fiduciary duty. He argues that the contract benefitted Sinclair by assuring a source of supply and disadvantaged Venezuelan by limiting it to one buyer. His rationale is bottomed on the fact, undisputed, that traditionally Sinclair's production does not meet its refinery requirements so it must go to the marketplace for crude.

I find that the making of the contract did not violate Sinclair's duty and I say this for several reasons. In the first place, an agreement between a dominated subsidiary and its parent does not *per se* violate a fiduciary duty. The law certainly does not go that far but, rather, subjects the agreement to the fairness test. Second, Sinclair had a right, if it so elected, to

---

10. "Posted prices" refers to prices published by producing companies around the world. In Venezuela the term meant those prices posted (published or announced) by the industry including Venezuelan.

11. At maximum, this is about 36,000 barrels daily, which was within 3% of Sinclair's total import quota in 1961.

integrate Venezuelan production into its corporate refining and marketing operations, limited only by the fairness rule. Third, as discussed hereafter, I find as a fact that the prices called for by the contract were fair to Venezuelan.[12] Fourth, there was an oversupply of crude oil in the world in 1961 and the contract assured Venezuelan of a market for its products.

Sinclair did not violate any duty to Venezuelan merely by making the contract.

### B.

Next, plaintiff argues that International breached the contract because it did not make payments when they were due. Plaintiff contends that Sinclair is therefore obligated to pay interest on the unpaid balances.

The agreement requires payment "upon receipt by Buyer of Seller's Invoice" and Venezuelan usually invoiced International on the date loading was completed. Sinclair admits that payments were delayed. And plaintiffs point out that the average uncollected daily balance was $2,790,000 during the years 1962 through 1966. Interest was never paid on any part of the balance and, according to plaintiff's computation (not disputed) this claim amounts to about $870,000.

Sinclair argues that a 30-day delay in payment was not unreasonable in the buyer's market for oil which prevailed from 1961 through 1966. It says that Venezuelan was paid sooner than an independent company would have made payment and a 10 to 14-day lag between receipt of invoice and payment is normal in the industry.

Sinclair committed itself to the contract and that was done primarily for its own benefit. By the contract Venezulean production was fully integrated with Sinclair operations, a source of supply (within 3% of import quota) was assured and Vene-zuelan was thus locked in to one buyer. And this was done in 1961 before Sinclair knew what would happen to world prices and production in the ensuing years. Certainly the contract was of value to Sinclair. Having contracted and gotten the advantages of the contract and having, in effect, specified all terms thereof including payment, Sinclair is not on sound ground when it argues that it should be excused for nonperformance. It fixed its own duty. At minimum the obligation of contract is the standard for measuring the duty in this instance.

Late payment of invoices by International is a breach of the contract and a breach of Sinclair's duty. Interest on the unpaid balance is an appropriate measure of damages. Restatement of the Law, Contracts, § 337, and this will be allowed at the legal rate prevailing in New York. On the basis of five days for delivery of an invoice to International, interest will be computed for each sale from the date which is five days after the date of invoice.[13]

### C.

I turn now to quantities. Plaintiff says that the contract was breached by International because it did not take the minimum quantities of crude and refined products in certain years. The evidence shows that: (a) in the years ending September 30, 1963, 1964, 1965 and 1966, International bought 8,896,304 barrels of crude oil less than it was obligated to do under the contract; (b) in the years ending September 30, 1962, 1963 and 1964, it bought 1,176,325 barrels of unfinished naptha less than the minimum; and (c) it bought 1,494,377 barrels of No. 2 fuel oil under the minimum for the years ending September 30, 1962, 1965 and 1966.

Sinclair says that during the years in question International purchased all oil and refined products that Venezuelan

---

12. Sinclair argues that the contract was made to benefit Venezuelan so it would have a tool or guide post in price negotiations with the Venezuelan government. But Sinclair also argues that the purpose of such negotiations was to *lower* prices, a result compatible with Sinclair's corporate interest, not Venezuelan's.

13. I note that Standard Oil paid interest on accounts owed to Creole.

produced and Venezuelan's reserves were being exploited at the "maximum efficiency rate" (MER) under straight natural flow conditions, i. e., unassisted by mechanical means such as well pumping devices or water injection into the wells. These facts are not undisputed. Venezuelan has been at MER since 1960.

Plaintiff argues that Sinclair had an absolute duty to purchase a fixed minimum amount of crude and refined products and Venezuelan should have procured them by any means at its disposal including exploration in existing concessions, the use of secondary production techniques, and the purchase of crude from other Venezuelan producers. Sinclair says that production could not have been increased from existing wells because the Venezuelan government was limiting production and the technology of 1961 to 1965 was such that the additional reserves that were discovered on its concessions in 1966 could not have been identified sooner. It also contends that the contract was executed to enable Venezuelan to justify in anticipated discussions with the government the discounts from posted prices on sales to affiliates, and quantity provisions of the contract were never intended to be binding on the parties but were intended to give Venezuelan "strength" in the discussions.

On numerous occasions from 1961 to 1966 the existence of the contract was publicly asserted by Venezuelan in notices of annual meetings to stockholders, filings with the Securities and Exchange Commission, the American Stock Exchange, and in reports to shareholders. Sinclair's management of Venezuelan certainly permitted it to control what Venezuelan said on this subject. Nowhere, so far as I know, was the contract referred to as merely a guide post and not meant to be binding upon the parties. It was the basis on which crude oil and refined products were transferred between the companies. Under these circumstances the Court cannot, in this litigation, rule on the premise that it never existed.

I have already reviewed the advantages that the contract brought to Sinclair. It must now suffer its disadvantages. I say this because, again, in my judgment, Sinclair fixed its own standard for its own purposes. And now, after the facts have been made, the Court should not excuse non-performance. And, factually, Sinclair has simply failed to show that the contract minimums could not be met. Indeed, Venezuelan never had an opportunity to try to meet them.

Admittedly Sinclair was limited by the American Government's Mandatory Oil Import Program but without considering what might have been available to supplement Sinclair quotas, the contract performance is not conditioned upon the availability of import quotas and Sinclair apparently elected to use portions of its quota for imports from Algeria, Colombia and elsewhere.

Sinclair will be required to account on this claim.

## D.

I next consider Sinclair's argument that a review of all of its transactions with Venezuelan shows that it was fair to the subsidiary and that should be the test of liability. The thrust here is that "overall" Venezuelan benefitted by its relationship with Sinclair and the final result should be determined accordingly. This is an equitable approach which has prima facie appeal: since "fairness" is the test applied to this parent-subsidiary transaction, why not disregard form, look to substance and see how the subsidiary made out over the span of time under scrutiny?

Such a catchall approach may have a place in testing the performance of duty in parent-subsidiary relations but I find it inappropriate here for several reasons. First, the result would be determined by the time span selected: would fair conduct in 1958 and 1959, for example, be weighed against 1963 unfair conduct? How far back should one go—far enough to find offsetting fair conduct? Second, two wrongs do not make a right. Waiver of

dividends in two prior years, for example, does not justify wasteful dividends in 1963. Third, our law in this area traditionally considers specific transactions and application would be made even more difficult if the Court were called upon to reach a "general verdict" based upon the balancing of what, by definition, involves a breach of fiduciary duty on one side against a conferring of benefits on the other.

In short, Sinclair cannot interpose "overall" fairness as a defense to each specific charge of a breach of fiduciary duty. Compare Mayflower Hotel Stockholders Protective Committee v. Mayflower Hotel Corp., 89 U.S.App.D.C. 171, 193 F.2d 666 (1951); III Scott on Trusts, § 213.

■ But this is not to say that Sinclair is without equity when it argues that Venezuelan benefitted by the contract. On the contrary, I am satisfied that it did, specifically in the prices called for by the agreement.

I find as a fact that a world surplus of crude emerged in 1958 and continued through the critical times in question here. As a result world prices were depressed below those fixed by the contract. Thus a typical crude was posted in Venezuela at $2.80 per barrel or a contract price (less 5% of posted) of $2.66; this 14¢ discount contrasted sharply with the 80¢ discount level which obtained in world markets. But posted prices in Venezuela remained unchanged after 1959 because its government insisted that prices for its oil not be discounted. Venezuela was the largest exporter of crude oil in the world and the result of this governmental pressure on prices was to maintain them at artificially high levels.

It is against this background that the contract prices must be examined. They represent the one significant part of the contract which Sinclair did not control. Prices were really fixed by a third party, the Venezuelan government. What effect should that fact be given?

Execution of the contract was, as I have indicated, an orderly and logical thing for Sinclair to do. There was no violation of fiduciary duty in unifying Venezuelan into Sinclair operations. Sinclair's fault was in violating the contract, not making it, and it must now respond for such violations. And I emphasize that Sinclair is not charged here with fraud or wilful or intentional harm to Venezuelan. Under these circumstances, and when prices were arbitrarily fixed by a third party, it seems to me fair and just that Sinclair should have an opportunity to show that the pricing formula conferred a benefit upon Venezuelan (Sinclair contends that the benefit was in the range of $20,000,000).

■ I conclude that Sinclair may show, as part of its case on the damage issue any benefit which the contract prices conferred on Venezuelan during the period in question. Judgment is reserved on the question of how much credit, if any, should be allowed to Sinclair for any such benefit conferred. Any such credit will be limited to derivative claims arising out of the contract with International. They will not be allowed as offsets against any other claim or accounting allowed herein.

I recognize the merit to plaintiff's argument on this issue. He says, among other things, that Venezuelan was locked in with Sinclair and thus was never given a chance to develop its own market and to test its own price-making capacity. And by contract standards, a price is a price. But fairness is the standard to which Sinclair is held and I do not believe that should be exacted without doing equity in return. This Court has the power to mold its decrees to the necessities of the case and, in my judgment, those here include a recognition of Sinclair's claim on the price question.

In my view, the evidence shows beyond doubt that contract prices were higher than market and remained so during the period in question, that the prices were fixed by government policy, that for that reason they were artificial, that Sinclair could

not change those prices, that Venezuelan benefitted from this arrangement, and that there is no allegation (or proof) of fraud or intentional wrongdoing by Sinclair.

## VI

I turn now to the claim based upon the filing of consolidated tax returns. In 1958 Sinclair caused Venezuelan to be reorganized in such a way as to permit its operations to be included in Sinclair's consolidated Federal tax returns. The dividends paid during the period 1958 through 1966 were thus distributed "tax free" to Sinclair. Sinclair received other benefits from the consolidated filings. Venezuelan was neither benefitted nor disadvantaged as a result of the filings.

Prior to trial I ordered, on the basis of Meyerson v. El Paso Natural Gas Company, supra, that absent a showing of "gross and palpable overreaching" on the part of Sinclair, it was not obligated to Venezuelan for tax savings resulting from the filing of consolidated returns. But I agreed with plaintiff's argument that the record, taken as a whole, raised an issue of fairness and that the single item thereof which the tax returns represent could not be resolved with certainty at the pretrial point. Compare Schott v. Climax Molybdenum Company, 38 Del.Ch. 450, 154 A.2d 221 (1959). I therefore deferred a ruling on this issue until after trial when it would be determined whether plaintiff has made the showing necessary for the award of independent relief.

Trial evidence was not directed to this specific claim. There was, indeed, no testimony as to the tax returns, their contents, nor of the advantages to Sinclair vis-a-vis the disadvantages to Venezuelan from the consolidations. Plaintiff relies, as I understand his position, on the proposition that the entire case is one of gross overreaching by Sinclair and that the returns are another illustration of abuse and the technique which Sinclair used.

Plaintiff argues that Sinclair never gave consideration to an allocation of the benefits to Venezuelan and that it caused the subsidiary to execute necessary consents to the filings before the end of the respective tax years. This is not a reasonable factual basis on which to distinguish *Meyerson*, as I think I have already held.

██ ██ To establish the consolidated tax returns as an independent grounds for relief, plaintiff was required to offer proof showing that such filings *per se* amounted to gross and palpable overreaching, or showing that the filings were part of a Sinclair pattern to use Venezuelan and its assets in fraud of minority rights. As to the first point, such proof was not made, and as to the second, I decline to make such a finding. Sinclair violated its duties to Venezuelan in the particulars already identified, but there was not a pattern of fraudulent exploitation which warrants a finding of gross and palpable overreaching with respect to tax returns. Accordingly, I conclude that plaintiff is not entitled to independent relief based upon the filing of consolidated tax returns.

\* \* \*

Finally, in the substantial and complete briefs filed by counsel many arguments were made but I have not spoken to all of them. Absence of comment, however, does not mean absence of consideration. All arguments were weighed but I have written only about those I regard as pertinent to the decision.

Sinclair's motion to dismiss the complaint will be denied and an order will be entered in accordance with the rulings made herein.