**Francis S. LEVIEN, Plaintiff,**

v.

**SINCLAIR OIL CORPORATION and Sinclair Venezuelan Oil Company, Defendants.**

Court of Chancery of Delaware.

Dec. 26, 1973.

See also, 300 A.2d 28.

Richard F. Corroon and Robert K. Payson of Potter, Anderson & Corroon, and Leroy A. Brill of Bayard, Brill & Handelman, Wilmington, and J. Lincoln Morris, Edward S. Cowen and Pollack & Singer, New York City, for plaintiff.

E. N. Carpenter, II, and R. Franklin Balotti of Richards, Layton & Finger, Wilmington, and Paul W. Williams, Floyd Abrams and Eugene R. Scheiman of Cahill, Gordon, Sonnett, Rheindel & Ohl, New York City, for defendant Sinclair Oil Corp.

Victor F. Battaglia of Biggs & Battaglia, Wilmington, for defendant Sinclair Venezuelan Oil Co.

DUFFY, Justice:[1]

This is a derivative action brought on behalf of Sinclair Venezuelan Oil Company (Sinven) against Sinclair Oil Corporation (Sinclair) and certain of its wholly-owned subsidiaries.[2] The order entered after a separate trial on the issue of liability was affirmed in part by the Delaware Supreme Court, Levien v. Sinclair Oil Corporation, Del.Ch., 261 A.2d 911 (1969) and 280 A.2d 717 (1971).[3] A full statement of facts appears in the earlier opinions.

This is the decision after trial on the issue of damages.

### A.

The pertinent part of this Court's order of February 26, 1970 which provided the basis for the trial on damages reads as follows:

"2. With respect to the contract dated September 28, 1961, between Sinclair International Company ('International') and Venezuelan [Sinven]:

(a) As to plaintiff's claims arising from the late payment of invoices during the period from October 1, 1961 through 1966, Sinclair shall account to Venezuelan for interest on the unpaid balance with respect to each sale, at the legal rate prevailing in New York, computed for each sale from the date which is five (5) days after the date of invoice to the date of payment.

(b) As to plaintiff's claims arising out of the failure by International to purchase the minimum contract quantities of crude oil and refined products during the period from October 1, 1961 through 1966, Sinclair shall account to Venezuelan for the damages which Venezuelan sustained as a result of such failure.

(c) Sinclair may show as part of its case on the damage issue under subparagraphs (a) and (b) above, any benefit which the contract prices conferred on Venezuelan during the period in question. Judgment is reserved on the question of how much credit, if any, shall be allowed to Sinclair for any such benefits conferred. Any such credit will be lim-

---

1. Sitting by assignment pursuant to the provisions of Art. 4, § 13 of the Constitution, Del.C.Ann.

2. Sinclair Oil Corporation was merged into Atlantic Richfield Co. in March 1969.

3. See also Levien v. Sinclair Oil Corporation, Del.Ch., 300 A.2d 28 (1972).

ited to derivative claims arising out of the contract with International as set forth in subparagraphs (a) and (b) above and will not be allowed as offsets against any other claim or accounting allowed herein."

Plaintiff contends that for late payment of invoices, Sinclair is liable in the amount of $711,095.86 plus interest (on this sum) totaling $442,060.39. Plaintiff thus seeks $1,153,156.25 for late payment of invoices.

As to failure by International to purchase minumum contract quantities (underlifting) of crude oil and refined products, plaintiff claims that Sinclair's liability for loss of profits amounts to $7,802,265.52, plus interest of $4,619,951.50, or a total of $12,422,217.02.

In short, plaintiff asks an award of $8,513,361.38 plus interest (as computed to May 31, 1973) of $5,062,011.89, or a judgment totaling $13,575,373.27 in favor of Sinven.

Defendant concedes that the arithmetic as to gross damage figures is correct; that is, there is no factual dispute about the formula which plaintiff uses in computing damages nor as to the arithmetic resulting from application of that formula. The parties are in wide disagreement, however, about the judgment.

Sinclair argues that gross damages should be reduced in three ways. First, it says that $3,326,000 should be deducted from the gross amount calculated as damages for underlifting; this is the profit made by Sinven on sales to third parties of crude oil and refined products which would have been purchased by International and so must be applied, argues Sinclair, in mitigation of the claim.[4]

Second, Sinclair urges that interest not be allowed. It says that an award of interest is a matter of discretion with the Court in a derivative suit and contends that it would be inequitable because, though Siven may have been denied use of monies not received, nevertheless during the same time it had the benefit of "over payments" represented by the difference between contract prices paid and prevailing market prices which were lower than contract. Thus it seeks to eliminate interest (the total claimed by plaintiff is $5,062,011.89) on any damages which are awarded.

Finally, Sinclair argues that it is entitled to a set-off exceeding $30,300,000 which it contends represents benefits conferred upon Sinven by the pricing formula of the contract.

### B.

■ I first consider Sinclair's claim to a $30,300,000 set-off which, if allowed, would neutralize any judgment to which Sinven may be entitled. Sinclair calculates this by computing the difference between the contract prices paid to Sinven and the competitive prices at which sales were made in the market during the same period.[5]

Plaintiff has not disputed the fact that the formula provided for prices above those which prevailed in the world market at the time but he argues that Sinclair is not entitled to any set-off or credit for this.

While I am satisfied that there are equities in Sinclair's favor which should be considered in fixing the relief to be ac-

4. Evidence as to third party sales was admitted at trial over plaintiff's objection that Sinclair should be barred from proving them because of its earlier position that Sinclair International had purchased all crude and refined products which Sinvan produced.

5. In support of its calculation Sinclair offered expert testimony constructing the "net-

back" value of Venezuelan crude and refined products during the years in issue, that is, the maximum prices which Venezuelan oil could have commanded in competition with other sources available to a domestic East Coast refiner; it also offered evidence of the price terms of negotiated contracts for the sale of Venezuelan oil during the period.

corded plaintiff, these do not require or permit allowance of $30,300,000 on the premise that Sinclair conferred such sum in "benefits" upon the subsidiary and, proportionately, the minority stockholders thereof. There was no such gratuitous giving involved. Simply stated, a contract was made between Sinclair and Sinven, its terms and indeed its very creation were dictated by Sinclair. Sinclair received benefits therefrom—an assured source of supply for a specified period, all spelled out in formal documentation, for example. But, of more significance, it provided a basis by which the price of crude coming out of Venezuela, sold by Sinven and bought by International, could be *reduced.* Thus, Mr. Lincoln testified:

"Q. Did you participate in the decision whether or not a written contract should be entered into at or about that time? A. Well, I entered into discussions concerning it, and gave my opinion.

Q. Did you make a recommendation? A. Yes.

Q. What was your recommendation? A. My recommendation at that time was that we certainly needed some type of official document to aid us in our discussions with the Venezuelan Government in the handling of the sale of crude and refined products.

Q. What were your reasons for that conclusion? A. Inasmuch as the prices received on the sale of crude and refined products was deteriorating in this period, it was obvious that to meet competition prices would still be reduced, and the Government's attitude was to attempt to pressure anyone from reducing any prices.

One of the points that they did accede to was that in the event that a company could obtain a sale of a sizable volume of crude or refined products over periods of time, they would take this into consideration in their discussion or in their acceptance of specified discounts.

Q. Take this into consideration? A. Take this, which would be a contract or an agreement entered into for relatively large volumes of crude or refined products over an extensive period of time."

Mr. Drescher's testimony was to the same effect.

There is no dispute as to this because Sinclair states that International was organized in 1961 and one of its purposes was to "absorb Sinven's available production . . . in a manner advantageous to Sinven and acceptable to the Venezuelan Government." Indeed, Sinclair concedes that the "sole purpose of the written contract" was to provide a formal document upon which to negotiate *lower* prices with the Venezuelan government.

Thus it is true that Sinven was paid more than world prices for crude and products, but it does not follow that Sinclair thereby conferred a benefit in the legal or equitable sense in the amount of the price differential. The fact is that the Venezuelan government permitted sales only at posted prices ($2.80 per barrel for crude) and that was one of the disadvantages of extracting oil in that Country. But that fact should not be applied here to the disadvantage of Sinven and its minority stockholders. Sinclair saw an opportunity to get the posted price reduced by 5% and for that reason it needed the contract.

In short, Sinven was undoubtedly benefitted by the contract but so was Sinclair. And to now give defendant all it claims in set-off would be, in effect, to ignore Sinclair's admitted purpose in causing the contract to be made and the benefits which it received as a result thereof. Given the contract and the purposes thereof, with the benefits and burdens to each side, it would be grossly unfair to now ignore or weigh lightly what was done and simply say that Sinclair was just conferring a benefit on Sinven.

I conclude that Sinclair should not be allowed on an independent basis any credit for benefits which the contract prices conferred on Sinven during the period in question. These are, however, to be considered in determining the extent of the relief to be awarded as discussed below.

### C.

■ Turning now to specific claims, it is undisputed that interest on late payment of invoices, under the order approved by the Supreme Court, amounts to $711,095.86. Judgment in that amount will be entered against Sinclair with interest thereon in the amount of $442,060.39. Sinclair has argued that interest should not be allowed on this (or any other claim) but, quite clearly, the principal sums were not paid when due, Sinven therefore was deprived of the use of such sums and interest is necessary to make it whole. 1 Restatement of Contracts § 329, Comment a. Compare Conestoga Chemical Corp. v. F. H. Simonton, Inc., Del.Supr., 269 A.2d 237 (1970); Metropolitan Mut. Fire Ins. Co. v. Carmen Holding Co., Del.Supr., 220 A.2d 778 (1966); E. M. Fleischmann Lumber Corp. v. Resources Corp. Int'l, 114 F.Supp. 843 (D.Del.1953); Superior Tube Co. v. Delaware Aircraft Industries, Inc., 60 F.Supp. 573 (D.Del.1945). The Supreme Court cases arose at law but this case has significant legal (contract) aspects and, in any event, fairness requires application of the principle of full compensation fron wrongs suffered.

### D.

I turn now to plaintiff's claim to $7,802,265.52 for underliftings. As I have indicated, computation of the sum is not in dispute.

Sinclair contends that any damages as to underliftings should be offset by profits of $3,326,000 made by Sinven on sales of crude oil and products to third parties, thus reducing this claim to $4,477,000 (which when added to $711,000 claimed for late payment of invoices equals the $5,188,000 that Sinclair submits is the maximum amount of any judgment).

In considering this claim the Court must decide whether a set-off is to be allowed under any theory. I have already determined that Sinclair is not entitled to the $30,300,000 credit which it claims for benefits conferred, but it does not follow that defendant is without equities to be considered. Before looking to those I first consider plaintiff's contention that under both legal and equitable principles Sinclair is not entitled to a credit in any amount against the claim for underliftings.

■ First, plaintiff argues that the claim is essentially legal in nature and, tested by standards applied at law, cf. Bokat v. Getty Oil Company, Del.Supr., 262 A.2d 246 (1970), Sinclair is not entitled to any credit against damages which Sinven sustained as a result of the breach of contract. It is axiomatic that the claim belongs to the Corporation and corporate action on it would necessarily be at law and governed by its standards. But it does not follow that in a derivative suit Chancery merely follows legal principles. On the contrary equity applies its own standards in processing derivative actions (absence of a right to jury trial, allowance of counsel fees and application of the intrinsic fairness standard are illustrations of these) and I am not persuaded that barring a set off to a claim legal in nature is necessarily one of these. Stated in the context of this case, I will not bar Sinclair from asserting its equities in the pricing arrangement on the theory that this amounts to an impermissible set-off under principles of contract law. I am not persuaded that such bar is required by the law in general or by the facts of this case.

■ Second, plaintiff argues also that Sinclair, as a matter of equity, has no right to any credit. In support of this he makes several contentions and he points to various amendments to the contract caused by Sinclair and the breaches which have

already been adjudicated by the Court. I see no reason for discussing such arguments in detail. It seems to me that the former amounts to a renewal of argument as to fairness of the contract terms at various times during the period and, as to that, the law of the case is that Sinclair did not violate any duty to Sinven by making the contract; I decline to re-examine or test its terms for fairness after liability has been litigated and we are now deciding damages.[6] As I indicated during trial, our present concern is with performance of the contract, not its terms. And as to breaches, the order of February 26, 1970 provides the basis for positive relief to Sinven and this should not be extended to deny Sinclair all claim to "benefits conferred" as a matter of law. In sum, I think that the Court should recognize Sinclair's claim as the equities may warrant to do justice in the case and to the extent of any such allowance I decline to apply an estoppel against it.

█ Third, plaintiff argues that Sinven's sales to third parties are irrelevant because Sinclair failed to prove that Sinven still could not have met the minimum quantities specified in the contract. In other words, plaintiff contends that the Court should regard the matter as one in which "two sales" were possible: (a) the contract quantities to Sinclair, and (b) actual sales to third parties. Compare Katz v. Exclusive Auto Leasing, Inc., Del. Super., 282 A.2d 866 (1971), and see 5A Del.C. § 2–708. In a context in which products available for sales are not limited, the rule argued by plaintiff is both logical and necessary to do justice to a seller who (factually) can make two sales (e. g., by purchases and/or by expanding production). But the difficulty I have in applying that rule here is that increase of products for sale was limited. The Court has determined that Sinven's production has been at MER since 1960.[7] And I doubt that the Venezuelan government would have permitted an increase in production from existing wells. Admittedly the problem is troublesome because of Sinclair's inconsistency in its position as to third-party sales and its failure to meet the burden of proving that Sinven could not meet contract minimums. But considering all circumstances, I conclude that the Court must consider Sinven's sales to third parties to do justice in the case.

█ I should here note again that at trial evidence as to profits on third-party sales was admitted over plaintiff's objection. Prior to the trial on damages Sinclair's position before the Court was that it had purchased all of Sinven's production (see 261 A.2d 924 and footnote 7, supra); the parties disagree as to whether in pretrial discovery Sinclair had misled plaintiff with regard to third-party sales.

As I view the case, Sinclair contended prior to the liability trial that it had purchased all of Sinven's production. Sales to third parties was thus a new—and different—matter introduced at the damage trial. But in reviewing the discovery documents on which Sinclair relies, I cannot say as a matter of law that it failed to disclose its position to plaintiff. It failed to disclose to the Court and, indeed, took a contrary position. But I am not persuaded that purposeful deception was involved or that the

6. Plaintiff's argument that the March 11, 1963 naptha amendment estops Sinclair from claiming any credit (because it reduced the price of naptha significantly below the price fixed by a naptha/80 octane gasoline ratio prior to the amendment) is also an attack upon the fairness of a contract term and I decline to consider it.

7. See 261 A.2d at 924:
"Sinclair says that during the years in question International purchased all oil and refined products that Venezuelan produced and Venezuelan's reserves were being exploited at the 'maximum efficiency rate' (MER) under straight natural flow conditions, i. e., unassisted by mechanical means such as well pumping devices or water injection into the wells. These facts are not undisputed. Venezuelan has been at MER since 1960."

Court was misled in a wrongful way. Compare Old Charter Distillery Co. v. Continental Distilling Corp., 174 F.Supp. 312 (D.Del.1959). And in fact, there were sales to third parties and there were profits to Sinven. In the absence of fraud or other conduct which should bar Sinclair from relying on and using for mitigation purposes Sinven's profits on third-party sales, I conclude that it may do so.

Finally, I consider plaintiff's claim for interest. I have already determined that such an allowance was necessary to make Sinven whole as to the claim based upon late payment of invoices. But I am not persuaded that the same approach is necessary here. The invoices were for crude and products actually delivered by Sinven to Sinclair and not paid for within the contract period. The claim for underliftings, on the other hand, is for purchases not made; more particularly, it is for profits not realized. And in considering the claim to interest I conclude that the Court should weigh the fact that Sinven was getting more than market prices for its products.

I have declined to grant the broad set-off which defendant has claimed and I have declined to bar all set-off for which plaintiff argues. I have previously noted that the Court has the power to mold its decrees to the necessities of the case and that includes a recognition of Sinclair's claim on the price question. The critical question, of course, is how is this to be done. In my judgment, the fairest and most appropriate way to do this is by exercising the Court's discretion as to the allowance of interest on the award for underliftings. In brief, I am persuaded that interest should be denied on that claim. I have already indicated some of the reasons for this and I add to them the undisputed fact that prices were really fixed by a third party—the Venezuelan government. See 261 A.2d at 926. As there suggested, some effect should be given this. In short, my view is that Sinclair should be held to the contract it made, damages should be awarded to Sinven for breach of that contract, but interest should not be. The judgment to be entered is based on that conclusion.

### E.

Judgment will be awarded in favor of Sinven and against Sinclair in accordance with the following computation:

| | | |
|---|---|---|
| (1) For late payment of invoices | | $ 711,095.86 |
| (2) Interest on such sum | | 442,060.39 |
| (3) Total | | 1,153,156.25 |
| (4) For underliftings | | 4,477,000.00 |
| (5) Total Judgment | | $5,630,156.25. |

\* \* \*

I should say also that I have considered other arguments made by the parties and have found them to be meritorious only to the extent applied herein.