Oswald L. Johnston, Floyd B. Odlum, and Airfleets, Inc., a
Delaware corporation (who were sued with George E. Allen,
Eastman Birkett and W. C. Rockefeller, as co-defendants),
Appellants,

*vs.*

Frances B. Greene and Myron L. Greene, Executors under the
Last Will and Testament of Louis A. Greene, deceased.
Appellees.

*Supreme Court, On Appeal, April 2, 1956.*

*Aaron Finger, Henry M. Canby, Louis J. Finger,* of Richards, Layton & Finger, Wilmington, and *Cyrus R. Vance,* of Simpson, Thacher & Bartlett, New York City, for appellants.

*Irving Morris,* Wilmington, and *Milton Paulson* and *Paul Roberts,* New York City, for appellees.

SOUTHERLAND, C. J., and WOLCOTT and BRAMHALL, JJ., sitting.

SOUTHERLAND, Chief Justice: The ultimate question in this case is the fairness of a transaction between a corporation and its president and dominating director. The court below held that he had appropriated for himself a corporate opportunity belonging to his corporation.

The pertinent facts, either uncontroverted or found by the Chancellor, are as follows:

Airfleets, Inc., is a Delaware corporation, organized in 1948 as a wholly owned subsidiary of Consolidated Vultee Aircraft Corporation (called "Convair"). Convair sometime thereafter distributed all of the Airfleets stock to its own stockholders. Atlas Corporation, an investment company, became Airfleets' largest single stockholder, owning about 18 per cent of its stock. Upon the organization of Airfleets the defendant Odlum became and has since been its president, without compensation. Odlum is also the president of Atlas, owning or controlling about 11 per cent of its stock. He is a man of varied business interests. At the time here material he also was chairman of the Board of Directors of Convair, a director of United Fruit Company, a director of Wasatch Corporation, and a trustee of several foundations.

Airfleets was organized to finance aircraft that might be sold or leased to the air lines. This purpose was never carried out. Airfleets' first business venture was the sale of certain aircraft manufacturing plants, aircraft, and related assets that it had acquired from Convair. By the fall of 1951 it had nearly completed the sale of these assets, and was in a liquid position, with about $2,000,000 in cash. It also held marketable securities worth about $1,500,000. It was looking for investments "without any predisposition as to the type". For example, it had funds in Spain received from the sale of planes to the Spanish Government. Its management had considered certain investments in Spain, including hotels, mines, motion pictures,

and "rainmaking". At this time, therefore, it was not a corporation with any well-defined object or purpose, other than that of employing its liquid assets for the profit of its stockholders. Certainly it was not then engaged in the business of manufacturing aircraft or aircraft accessories.

In late December of 1951 a business opportunity was brought to the attention of Mr. Odlum in the following circumstances:

Mr. Lester E. Hutson was the owner of all the stock of Nutt-Shel Company, a California corporation operating a plant in or near Los Angeles for the manufacture of self-locking nuts used in aircraft. Hutson also owned certain patents and patent applications covering the device. A license agreement was in effect, granting to Nutt-Shel exclusive rights in respect of the patents.

Hutson's health had not been good. In 1950 he told General Ralph P. Cousins, who was interested in a similar business, that he would be willing to sell the Nutt-Shel enterprise. Cousins attempted to interest a company in Pennsylvania, but nothing came of it. During 1951 Hutson entered into negotiations with two individuals, Dohn and Connors. At first he thought of selling only the patents, but later concluded to sell also at least part of the stock. The parties came to an agreement on the price—$350,000 for the patents and $1,000,000 for the stock—but the negotiations were never completed. Dohn and Connors lacked the funds to make an outright purchase. They wanted to buy only 20 per cent of the stock with an option upon the rest. They were planning to separate the ownership of the patents from the ownership of the stock.

Hutson was reluctant to sell the stock on a time basis. He told Cousins of the status of the proposed sale to Dohn and Connors, and Cousins suggested that he (Cousins) talk to Mr. Odlum about it. Hutson assented. Hutson knew of Odlum by reputation as a well-known financier and president of Atlas Corporation, and as a man engaged in various enterprises. Hutson had never heard of Airfleets. Cousins was a friend of Odlum's, having known Odlum since 1942, and was to spend New Year's weekend with Odlum at the latter's

ranch in California. He also knew of Odlum's association with Convair and Atlas, but had never heard of Airfleets.

On the Friday before New Year's Cousins broached the subject and outlined to Odlum the history and nature of the Nutt-Shel business. Odlum was interested, and a few days later Hutson came to the ranch to discuss the matter and furnish Odlum with financial data. The price was the same as that offered to Dohn and Connors. Hutson was willing to sell the patents separately but would not sell the stock separately. He would have preferred to retain a controlling interest in the stock but Odlum said he would have to have the controlling interest. Hutson told Odlum that he had been advised by his attorney, and that "the discussion had come up during the Dohn-Connors negotiations", that it would be advisable to have the patents under separate ownership. The reason for this was the possibility of the disallowance of the royalty expense on renegotiation of government contracts, as payments from a wholly-owned corporation to its sole stockholder. About 75 per cent of Nutt-Shel's business in 1952 was subject to renegotiation.

Hutson returned a few days later with additional data. Mr. Rockefeller, Odlum's executive assistant at Convair and a director of Airfleets, was present. He sat in on the discussions and took the papers home with him. Odlum had the Nutt-Shel plant inspected by Mr. Ryan, of the Convair organization. Ryan's report was very favorable. Odlum also received a telephone call from Rockefeller, advising him of the result of Rockefeller's study of the papers. Odlum decided to make the purchase. On February 10 he talked to Hutson by telephone, confirmed the price—"$350,000 dollars for the patents, $1,000,000 for the stock"—and told Hutson that he had decided to buy the entire deal. He then arranged, through his New York counsel, for the employment of attorneys in California to handle the closing of the transaction.

Odlum appears to have decided almost at once not to take the deal for himself. Because he was in the highest income tax bracket he was interested in capital gains rather than increased income. He discussed the whole matter with his tax adviser. He considered the

tax and invested capital situation of Atlas and concluded that the Nutt-Shel investment would not be suitable for Atlas—again, apparently, for tax reasons. He then called a friend in New York who "ran" a foundation, and suggested that Pathé Industries might be interested in it. His friend later reported that Pathé would be prepared to pay the million dollars that was the cost of the stock, plus a bonus in stock of Pathé, but that Pathé would not be interested in the patents because they should be split into different ownership.

At about this time Odlum was advised by his tax consultant that the acquisition of Nutt-Shel might fit very well into the tax problems of Airfleets. Odlum requested further study of the matter, as a result of which he concluded to submit the proposition to Airfleets' Board of Directors.

Between the 24th and 28th of January Odlum had several conversations about the matter with two of his fellow directors of Airfleets, Rockefeller and Johnston. The latter is a member of the legal firm that represents Atlas, Airfleets and Odlum. Odlum told Johnston that he had been advised by Hutson of the desirability of separating the ownership of the stock from the ownership of the patents, because of the possibility of the disallowance of royalty payments on renegotiation of government contracts. Johnston was uninformed on the matter. He called his office and asked that it be checked. They called back and said that they thought there was a possibility of disallowance, and Johnston so advised Odlum.

The three directors reached the conclusion that the stock would be a desirable investment for Airfleets, but that it would be undesirable to acquire the patents. The reasons were two: first, the undesirability of investing the additional $350,000, or a total investment of about two-thirds of Airfleets' net assets, in one enterprise; and second, the possibility of the disallowance of the royalty payments. Odlum told them that in those circumstances, in order to make it possible for the company to buy the stock, he would undertake to find buyers for the patents, and if necessary would take himself whatever interest was not so disposed of.

A formal meeting of the board was held on January 28th, the three named directors being present. The board (Odlum not voting) voted to acquire the stock but not the patents. The Chancellor found that Odlum dominated the other directors and that the decision not to acquire the patents was his. This finding we accept.

On February 8th formal contracts of sale between Hutson and Airfleets, covering the stock, and between Hutson and Odlum, covering the patents, were signed. The transaction was closed in the latter part of the month.

In the meantime Odlum had arranged for the purchase of the patents for $350,000, in undivided interests, by 37 different persons and corporations, including himself. His own retained interest is about 7½ per cent. Odlum testified that he had expected to sell this interest, but after the propriety of the transaction had been questioned by an Airfleets stockholder, his position became "frozen".

The rejection of the opportunity to buy the patents is attacked as a breach of Odlum's fiduciary duty to Airfleets. The complaint charges (1) that Hutson offered to sell the patents to Airfleets for $350,000; (2) that the patents were useful and necessary to Airfleets in the conduct of the Nutt-Shel business, and the opportunity to purchase them was a valuable asset of Airfleets; (3) that the directors, under the domination of Odlum, who controlled the management of Airfleets, caused Airfleets to reject the offer, in violation of their fiduciary duty; and (4) that Odlum caused the patents to be purchased for himself and certain of his associates subject to his control.

The case made by the complaint is thus one of the unlawful diversion of a corporate opportunity for the benefit of the president and dominating director of a corporation.

The general principles of the law pertaining to corporate opportunity are settled in this state. *Guth v. Loft,* 23 *Del.Ch.* 255, 5 *A.2d* 503, 510. Speaking for the Supreme Court, Chief Justice Layton said:

> "It is true that when a business opportunity comes to a corporate officer or director in his individual capacity rather than in

his official capacity, and the opportunity is one which, because of the nature of the enterprise, is not essential to his corporation, and is one in which it has no interest or expectancy, the officer or director is entitled to treat the opportunity as his own, and the corporation has no interest in it, if, of course, the officer or director has not wrongfully embarked the corporation's resources therein. * * *

"On the other hand, it is equally true that, if there is presented to a corporate officer or director a business opportunity which the corporation is financially able to undertake, is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which the corporation has an interest or a reasonable expectancy, and, by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of his corporation, the law will not permit him to seize the opportunity for himself."

■ The application of these principles depends on the facts. Whether or not the director has appropriated for himself something that in fairness should belong to his corporation "is a factual question to be decided by reasonable inference from objective facts." *Guth v. Loft, supra,* 23 *Del.Ch.* 277, 5 *A.2d* 513.

The Chancellor found that the purchase of the patents was not essential to Airfleets' business, and assumed that it was not one in which the corporation had an expectancy. But he held that it was one in which Airfleets had an interest in the sense that through Odlum it was actively seeking valuable investments, for which it had available funds, and that it was Odlum's duty to find such opportunities.

He also found that Odlum's decision to reject the opportunity to buy the patents was taken in his own interest because by affording friends, associates, and others the opportunity to buy the patents Odlum was satisfying obligations of his own.

The foundation of the Chancellor's reasoning is his holding that when the opportunity came to Odlum to buy the patents, it belonged to Airfleets because Airfleets was seeking opportunities for invest-

ment. If that conclusion is sound, Odlum could not take the patents for himself, nor could he divert them to others. Do the admitted facts justify the finding?

The first important fact that appears is that Hutson's offer, which was to sell the patents and at least part of the stock, came to Odlum, not as a director of Airfleets, but in his individual capacity. The Chancellor so ·found. The second important fact is that the business of Nutt-Shel—the manufacture of self-locking nuts—had no direct or close relation to any business that Airfleets was engaged in or had ever been engaged in, and hence its acquisition was not essential to the conduct of Airfleets' business. Again, the Chancellor so found. The third fact is that Airfleets had no interest or expectancy .in the Nutt-Shel business, in the sense that those words are used in the decisions dealing with the law of corporate opportunity.

> "Whether in any case an officer of a corporation is in duty bound to purchase property for the corporation, or to refrain from purchasing property for himself, depends upon whether the corporation has an interest, *actual or in expectancy,* in the property, or whether the purchase of the property by the officer or director may hinder or defeat the plans and purposes of the corporation in the carrying on or development of the legitimate business for which it was created." *Colorado & Utah Coal Co. v. Harris,* 97 *Colo.* 309, 49 *P.2d* 429; quoted in Fletcher, *Cyclopedia Corporations,* § 861.1. [Italics supplied.]

For the corporation to have an actual or expectant interest in any specific property, there must be some tie between that property and the nature of the corporate business. *Cf. Guth v. Loft, supra,* in which the Court said: "The tie was close between the business of Loft and the Pepsi-Cola enterprise". 23 *Del.Ch.* 279, 5 *A.2d* 515. No such tie exists here. Airfleets had no interest, actual or in expectancy, in the Nutt-Shel business.

We accordingly find ourselves compelled to disagree with the Chancellor's decision. Recognizing that Airfleets had no expectancy in the Nutt-Shel business and that its acquisition was not essential to Airfleets, he nevertheless held that Airfleets' need for

investments constituted an "interest" in the opportunity to acquire that business. Now, this is an application of the rule of corporate opportunity that requires careful examination. It is one thing to say that a corporation with funds to invest has a general interest in investing those funds; it is quite another to say that such a corporation has a specific interest attaching in equity to any and every business opportunity that may come to any of its directors in his individual capacity. This is what the Chancellor appears to have held. Such a sweeping extension of the rule of corporate opportunity finds no support in the decisions and is, we think, unsound.

It is, of course, entirely possible that a corporate opportunity might in some cases arise out of a corporate need to invest funds and the duty of the president or any other director to seek such an opportunity. But whether it does arise, in any particular case, depends on the facts—upon the existence of special circumstances that would make it unfair for him to take the opportunity for himself.

We cannot find any such circumstances in this case. At the time when the Nutt-Shel business was offered to Odlum, his position was this: He was the part-time president of Airfleets. He was also president of Atlas—an investment company. He was a director of other corporations and a trustee of foundations interested in making investments. If it was his fiduciary duty, upon being offered any investment opportunity, to submit it to a corporation of which he was a director, the question arises, Which corporation? Why Airfleets instead of Atlas? Why Airfleets instead of one of the foundations? So far as appears, there was no specific tie between the Nutt-Shel business and any of these corporations or foundations. Odlum testified that many of his companies had money to invest, and this appears entirely reasonable. How, then, can it be said that Odlum was under any obligation to offer the opportunity to one particular corporation? And if he was not under such an obligation, why could he not keep it for himself?

Plaintiff suggests that if Odlum elects to assume fiduciary relationships to competing corporations he must assume the obligations that are entailed by such relationships. So he must, but what are

the obligations?  The mere fact of having funds to invest does not ordinarily put the corporations "in competition" with each other, as that phrase is used in the law of corporate opportunity.  There is nothing inherently wrong in a man of large business and financial interests serving as a director of two or more investment companies, and both Airfleets and Atlas (to mention only two companies) must reasonably have expected that Odlum would be free either to offer to any of his companies any business opportunity that came to him personally, or to retain it for himself—provided always that there was no tie between any of such companies and the new venture or any specific duty resting upon him with respect to it.  3 Fletcher, *Cyclopedia Corporations,* § 862.

It is clear to us that the reason why the Nutt-Shel business was offered to Airfleets was because Odlum, having determined that he did not want it for himself, chose to place the investment in that one of his companies whose tax situation was best adapted to receive it.  He chose to do so, although he could probably have sold the stock to an outside company at a profit to himself.  If he had done so, who could have complained?  If a stockholder of Airfleets could have done so, why not a stockholder of Atlas as well?

It is unnecessary to labor the point further.  We are of opinion that the opportunity to purchase the Nutt-Shel business belonged to Odlum and not to any of his companies.

This conclusion requires the rejection of the plaintiffs' contention, and of the Chancellor's holding, that the opportunity to buy the Nutt-Shel business belonged to Airfleets.  But it does not in itself dispose of the case.

The refusal of the directors of Airfleets to buy the patents was, under the Chancellor's finding, a transaction between the dominating director and his corporation.  It is therefore subject to strict scrutiny, and the defendants have the burden of showing that it was fair.

The facts surrounding the transaction are not in dispute.  Odlum had chosen to put Airfleets in the Nutt-Shel business.  The patent

rights were therefore essential to Nutt-Shel, and ordinarily it would follow that it would be advantageous to Airfleets to acquire the patents, even though Nutt-Shel had an exclusive license to exploit them. *Bailey v. Jacobs*, 325 *Pa.* 187, 189 *A.* 320; *Farwell v. Pyle-National, etc., Co.*, 289 *Ill.* 157, 124 *N.E.* 449, 10 *A.L.R.* 363; *Averill v. Barber*, 53 *Hun* 636, 6 *N.Y.S.* 255. But there are important factual distinctions between these decisions and the case at bar. In those cases the director had acquired the patents for his own profit, although there was no reason why the corporation should not have acquired them.

In the instant case the rejection of the patents was based upon Odlum's judgment that the acquisition would be undesirable for Airfleets, and he did not seek to profit personally by acquiring them for himself. The transaction must of course be viewed in the light of the situation confronting Odlum at the time they were first offered to Airfleets. At that time he had been told by Hutson that the latter's attorney had advised separation, and that Dohn and Connors had also contemplated separate ownership. He had been told that Pathé would not be interested in buying the patents because they should be held in different ownership. Finally, upon requesting the opinion of his own counsel upon the point, he received advice tending to confirm what he had before been told. He thereupon determined to pay Hutson for the patents and distribute the ownership among third persons.

Now, a fair way to determine the propriety of Odlum's action "is to consider whether the proposition submitted would have commended itself to an independent corporation." *International Radio Tel. Co. v. Atlantic Communications Co.*, 2 *Cir.*, 290 *F.* 698, 702. It is clear to us that if a wholly independent board of directors had determined, upon the information received by Odlum, that it was undesirable for Airfleets to buy the patents and that they should be transferred to third persons, a reviewing court would not think of disturbing its judgment upon the matter. Moreover, it is a fair conclusion that in the light of this information received from four separate sources the separation of the ownership of the patents would have commended itself to an independent board of directors.

As to this question of the hazard of the possible disallowance of royalties on renegotiations, the Chancellor observed that the directors

must have known that for sometime the close ownership of the patents had existed as to Hutson, yet he had not suffered thereby. This is to say that because the government had not yet acted in the matter the hazard of adverse action was negligible. This by no means follows. A business man would hardly be justified in making such an assumption and predicating an important decision upon it. In this case it appears that the renegotiation reports covering the Nutt-Shel operations for the year ending October 31, 1951, were not filed until 1954. In any event, there is nothing to show that Odlum could safely assume that the government would decide in Hutson's favor. A hazard of increased tax or other liability, dependent on the future construction and application of a government regulation, is not a matter lightly to be disregarded.

That Hutson subsequently apparently received a clearance from the regional negotiation board in respect to the allowance of royalties, is, of course, immaterial. The question turns on the situation as it existed when Odlum's decision was made.

There is the further circumstance that Odlum thought that one million dollars was sufficient to put into the venture, constituting in itself nearly half of Airfleets' net assets. We cannot say, of course, that on this matter an independent board would have in all likelihood agreed with Odlum; they might, or they might not. But certainly such a consideration is more than a mere pretext or excuse for rejecting the purchase of the patents. The Chancellor thought it not persuasive because Airfleets' existing investments were of a temporary nature, and could readily have been sold to provide more cash. This hardly seems to touch the point of the proportion of the required investment—$1,350,000—to total net assets; moreover, whether and at what time any investment should be sold is peculiarly a matter of business judgment.

Now, as the Chancellor found, Odlum made these decisions on behalf of Airfleets. If, after making them, he had elected to keep the patents for himself, a serious question would be presented whether he had sustained the burden of establishing fairness. In that event there would have been presented a question of conflict between his

self-interest and his duty to make these decisions uncolored by his own interests. In such a case a reviewing court might apply the rule, invoked by plaintiff, "that ascribes to self-interest rather than to a sense of duty the motive power of ensuing action". *Loft v. Guth,* 23 *Del.Ch.* 138, 169, 2 *A.2d* 225, 239.

But Odlum did not seek to profit personally by what he had done. He promptly divested himself, prior to the closing of the transaction, of almost the entire interest in the patents. His explanation of the retention of the seven and one-half per cent interest seems entirely reasonable; and we are told that it is still his intention to sell this retained interest if he is permitted to do so. If this is done, there will remain about a four and three-tenths per cent interest owned by himself and his wife. His personal interest in the income from the patents, in the light of his financial situation, is therefore negligible. His financial interest in Airfleets is much greater.

The Chancellor held that Odlum's sale of the patents was a means whereby he satisfied certain "felt" obligations to friends and associates of his own or of his wife. This finding appears to refer to Odlum's testimony that some of the assignees were people for whom he felt "some sort of moral responsibility to help them with their personal affairs". The large majority of the assignees, however, were not of this class. We do not think that it can be fairly said that Odlum profited personally from the sale. The Chancellor's finding that the sale of the patents was improper was, we think, based on his holding that the Nutt-Shel business, including the patents, was a corporate opportunity belonging to Airfleets. If that were so, then his conclusion would be sound, since, as he said Odlum's motive in allowing friends, associates and others to buy the patents could not justify the diversion from Airfleets of an asset belonging to it. But we are of opinion, as above stated, that this is not a case of corporate opportunity, and is to be judged by the test applicable to a transaction between the dominating director and his corporation—the test of fairness.

Plaintiffs contend that Airfleets' assets were used to enable Odlum to buy the patents. The argument runs as follows:

Hutson was unwilling to sell the patents unless a purchaser could be found for the stock; Odlum's ability to purchase the patents was thus wholly dependent on the use of Airfleets' funds to purchase the stock; and this constituted the use of Airfleets' funds to purchase the patents.

The fallacy of this argument is plain. Its implicit major premise is the assumption that Odlum wanted the patents for himself, and merely used Airfleets as a means whereby he got rid of the stock and kept the patents for himself. This is directly contrary to the testimony. Odlum did not want the patents. Because he was in the highest income bracket he was looking for capital gains. And he did not take the patents for himself. Moreover, there is no suggestion that the purchase of the stock was not a sound investment for Airfleets. The whole basis of this contention is unsound.

■ Our conclusions upon a careful review of this record are: first, that the opportunity to acquire the Nutt-Shel business did not belong to Airfleets; second, that the transaction between Odlum and Airfleets involving the patents was fair and free of any overreaching or inequitable conduct.

It follows that the judgment of the Court of Chancery must be reversed. The cause is remanded to that court, with directions to vacate the judgment and dismiss the complaint.