

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-12-00630-CV

**THE HUFF ENERGY FUND, L.P.**, WRH Energy Partners, L.L.C., William R. "Bill" Huff,
Rick D'Angelo, Ed Dartley, Bryan Bloom, and Riley-Huff Energy Group, LLC,
Appellants

v.

**LONGVIEW ENERGY COMPANY**,
Appellee

From the 365th Judicial District Court, Zavala County, Texas
Trial Court No. 11-09-12583-ZCVAJA
Honorable Amado J. Abascal, III, Judge Presiding

Opinion by: Sandee Bryan Marion, Chief Justice
Concurring Opinion by: Marialyn Barnard, Justice
Dissenting opinion by: Luz Elena D. Chapa, Justice, joined by Rebeca C. Martinez, Justice
Concurring and Dissenting Opinion by: Patricia O. Alvarez, Justice

Sitting en banc:  Sandee Bryan Marion, Chief Justice
      Karen Angelini, Justice
      Marialyn Barnard, Justice
      Rebeca C. Martinez, Justice
      Patricia O. Alvarez, Justice
      Luz Elena D. Chapa, Justice
      Jason Pulliam, Justice

Delivered and Filed:  November 25, 2015

REVERSED AND RENDERED

In the underlying lawsuit, appellee, Longview Energy Company ("Longview"), sued two

of its directors and others for, among other claims, breach of fiduciary duty by taking a corporate

opportunity that belonged to Longview.  Following a jury trial, several liability questions were

submitted to the jury. The two liability questions addressed in this opinion asked whether either of the directors (1) failed to comply with his fiduciary duty to Longview by taking a corporate opportunity and (2) failed to comply with his fiduciary duty of loyalty by improperly engaging in competition with Longview. The jury answered affirmatively to both questions, as well as affirmatively to other questions that held all the defendants liable. The trial court awarded Longview $95.5 million in monetary disgorgement and imposed a constructive trust on a variety of assets owned by one of the defendants. On appeal, appellants, the defendants below, all raise— in addition to other issues—legal sufficiency challenges to the evidence in support of the liability findings. Because we conclude the evidence is legally insufficient to support the jury's finding on the corporate opportunity question and because we conclude Longview did not plead a competition cause of action, we reverse and render a take-nothing judgment in favor of appellants.

## BACKGROUND

The defendants below and appellants here are two of Longview's directors, William R. "Bill" Huff and Rick D'Angelo. The other defendants/appellants are The Huff Energy Fund, L.P. ("HEF"), WRH Energy Partners, L.L.C., and Riley-Huff Energy Group, LLC ("Riley-Huff Energy").[1] At the center of this dispute are leases in the Eagle Ford shale, an oil and gas formation encompassing thirteen million acres in South Texas.

Longview is an oil and gas company. In 2006, HEF purchased stock in Longview, which entitled HEF to appoint Bill Huff and Rick D'Angelo to Longview's board of directors. Bill Huff is the head of HEF and Rick D'Angelo evaluated potential energy investments for HEF. Sometime in 2009, HEF and Bobby Riley formed Riley-Huff Energy. In mid-2009, HEF encouraged its portfolio companies, including Longview, to explore investment opportunities in the Eagle Ford.

---

[1] Two other defendants were Ed Dartley and Bryan Bloom. The trial court's judgment ordered Longview to take nothing of and from Bloom and Dartley, and this portion of the judgment was not challenged on appeal.

On September 10, 2009, representatives of both HEF and Longview met in New Jersey to discuss investment strategies for Longview, including the Eagle Ford shale. According to Longview, it was at this meeting that Bill Huff agreed to fund any investment "that Rick Pearce likes." Pearce is Longview's chief operating officer and senior petroleum engineer. Over the next several months Longview's management investigated opportunities in the Eagle Ford shale. Longview commissioned an Eagle Ford shale study from consulting geologist/geophysicist Mark Lober. At the time, Lober had been consulting with Pat Gooden, an Eagle Ford land broker, on another deal. Gooden, in turn, had been working with another Eagle Ford land broker, Tamara Ford, who operated under the name Wyldfire Energy. Longview's management later met with Gooden and Ford to discuss Eagle Ford leases. At Longview's first meeting with the land brokers on December 2, 2009, neither Gooden nor Ford presented any specific leases to Longview. Instead, Ford drew circles on a map of various counties to indicate general areas where acreage/leases were available.

On December 17, 2009, Longview's management, Lober, and D'Angelo met to discuss Lober's geological findings, Longview's economic plans, development of the Eagle Ford acreage, and the land brokers. On December 21, 2009, Longview's management had its second meeting with the land brokers. New circles, or "blobs," were added to the maps, but no specific leases were identified. At about this same time, Ford was also meeting with Bill Riley. Throughout the remainder of December 2009 and into early January 2010, Longview's management and D'Angelo continued to discuss Lober's work and various maps.

Longview's management ultimately decided to present an investment proposal to its board of directors at the board's January 28, 2010 board meeting. In advance of this meeting, Bob Gershen, Longview's president and CEO, distributed reading materials to the directors. These materials included a proposed strategy for investing in the Eagle Ford and economic projections.

At the board meeting, Rick Pearce presented Longview's plan to invest $40 million—to be acquired from Huff—to purchase 20,000 Eagle Ford acres. The maps shown to the board, acquired from Ford and Gooden, showed available acreage but not specific leases within the acreage. After the presentation, the board did not vote on the proposal because, according to Longview, D'Angelo said Huff would not support an investment in Eagle Ford trend acreage. During a subsequent investigation, Longview's management learned that three days before the January 28 board meeting, Riley-Huff Energy signed a contract with Wyldfire to purchase some of the same acreage Longview was considering buying through the same land brokers. This contract was not mentioned at the January 28 board meeting. After not receiving Huff's investment, and after considering other funding options and conducting additional board meetings on February 1 and February 5, 2010, Longview took no further action on its Eagle Ford investment plan. In the meantime, Riley-Huff Energy acquired approximately 44,698 Eagle Ford acres for its own use.

Longview sued raising a variety of claims: (1) breach of fiduciary duty/usurpation of corporate opportunity against Huff and D'Angelo; (2) fraud against all defendants; (3) tortious interference with prospective business relationships against all defendants; (4) misappropriation of trade secrets against all defendants; (5) aiding and abetting against all defendants; and (6) conspiracy against all defendants. Ultimately, only two liability questions were submitted to the jury: (1) did Huff and/or D'Angelo fail to comply with their fiduciary duty to Longview by taking a corporate opportunity; and (2) did Huff and/or D'Angelo fail to comply with their fiduciary duty of loyalty to Longview by engaging in competition with Longview without the informed approval of Longview's board.[2] The jury answered "yes" to the questions. The trial court rendered

---

[2] Other questions were also submitted regarding whether Riley-Huff Energy and/or The Huff Energy Fund LP knowingly participated in Huff's and/or D'Angelo's failure to comply with their fiduciary duty (the aiding/abetting claim); and whether Riley-Huff Energy wrongfully obtained assets in the Eagle Ford shale as a result of Huff's and/or

judgment in favor of Longview, and awarded Longview a constructive trust of various assets owned by Riley-Huff Energy as well as a $95 million monetary award.

## STANDARD OF REVIEW

Appellants, who did not have the burden of proof at trial, all raise legal sufficiency challenges to the evidence. "A party will prevail on its legal-sufficiency challenge of the evidence supporting an adverse finding on an issue for which the opposing party bears the burden of proof if there is a complete absence of evidence of a vital fact or if the evidence offered to prove a vital fact is no more than a scintilla." *Waste Mgmt. of Texas, Inc. v. Texas Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 156 (Tex. 2014); *see also City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). "More than a scintilla exists when the evidence as a whole rises to a level enabling reasonable and fair-minded people to have different conclusions." *Waste Mgmt. of Texas*, 434 S.W.3d at 156; *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). "However, if the evidence is so weak that it only creates a mere surmise or suspicion of its existence, it is regarded as no evidence." *Waste Mgmt. of Texas*, 434 S.W.3d at 156. In conducting a legal-sufficiency review, we consider the evidence in the light most favorable to the judgment, crediting evidence that a reasonable fact finder could have considered favorable and disregarding unfavorable evidence unless the reasonable fact finder could not. *City of Keller*, 168 S.W.3d at 807. We indulge every reasonable inference that supports the trial court's findings. *Id.* at 822. "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Id.* at 827.

---

D'Angelo's failure, if any, to comply with their fiduciary duty. Longview did not submit its claims for fraud, tortious interference with prospective business relationships, misappropriation of trade secrets, and conspiracy to the jury.

## JURY QUESTION NUMBER ONE

The jury was first asked whether Bill Huff and Rick D'Angelo failed to comply with their "fiduciary duty to Longview Energy Company by taking a corporate opportunity." Specifically, the jury was asked as follows:

> Did [Bill Huff and/or Rick D'Angelo] fail to comply with his fiduciary duty to Longview Energy Company by taking a corporate opportunity?
>
> Because they are Longview Energy Company directors, Bill Huff and Rick D'Angelo owe fiduciary duties to Longview Energy Company with respect to corporate opportunities.
>
> A Longview Energy Company director may *not* take a corporate opportunity for himself if:
>
> (1) Longview Energy Company had an interest or a reasonable expectancy in the opportunity;
> (2) Longview Energy Company was financially able to pursue the opportunity;
> (3) the opportunity was within Longview Energy Company's line of business; *and*
> (4) the director diverted the business opportunity to another and thus brought the director's interests into conflict or competition with Longview Energy Company's interest.
>
> A Longview Energy Company director *may* take a corporate opportunity for himself if:
>
> (1) the business opportunity is first presented to the director in his individual and not his corporate capacity;
> (2) the opportunity is not essential to the corporation;
> (3) the corporation does not have an interest or expectancy in the business opportunity; *and*
> (4) the director has not wrongfully employed the resources of the corporation pursuing the opportunity.

[Emphasis added.]

As the first part of this question was phrased, to hold Huff and/or D'Angelo liable for taking a corporate opportunity, the jury was required to make affirmative implied findings on all of the first four factors relevant to when a director may *not* take a corporate opportunity. Because

the jury answered "yes" as to both Huff and D'Angelo, the jury impliedly found that (1) Longview had an interest or a reasonable expectancy in the opportunity; (2) Longview was financially able to pursue the opportunity; (3) the opportunity was within Longview's line of business; and (4) the director diverted the business opportunity to another and thus brought the director's interests into conflict or competition with Longview's interest.

On appeal, Huff and D'Angelo assert there is legally insufficient evidence that they breached their fiduciary duty to Longview by usurpation of corporate opportunity because (1) Longview had no actual, cognizable interest or expectancy in any specific property, but only "a self-labeled 'hypothetical' plan to invest in" the Eagle Ford; (2) the idea to invest in the Eagle Ford originated from Huff and D'Angelo in their investment management roles at HEF and thus was not presented to them as directors of Longview; (3) Longview did not have the financial ability to "fund its 'hypothetical' plan," and neither HEF, Huff, nor D'Angelo had a duty to fund Longview's investments; (4) Longview's board voted to reject the opportunity to invest in the Eagle Ford; and (5) there is no evidence that Huff or D'Angelo personally benefitted from or took an opportunity for himself. Huff and D'Angelo also argue they were not required to establish the first four factors relevant to when a director may not take a corporate opportunity because there is a threshold legal question of whether a corporate opportunity existed. Based on this argument, Huff and D'Angelo contend that because there was no corporate opportunity to be taken in this case, there is no reason for this court to examine the four factors set forth in question number one.

An appellate court must measure the sufficiency of the evidence by the jury charge as it was submitted. *Romero v. KPH Consol., Inc.*, 166 S.W.3d 212, 221 (Tex. 2005); *Oliva v. Davila*, 373 S.W.3d 94, 101 (Tex. App.—San Antonio 2011, pet. denied). Therefore, we do not review the evidence to determine whether a corporate opportunity did, in fact, exist. Instead, we review the evidence to determine only whether legally sufficient evidence supports the jury's four implied

findings as stated in question number one. Because we conclude the evidence is legally insufficient to support the first implied finding, which is dispositive of this liability issue, this opinion discusses only whether Longview "had an interest or a reasonable expectancy in the opportunity." *See* TEX. R. APP. P. 47.1.

Longview is a Delaware corporation, and the parties agree Delaware's corporate opportunity law governs Huff's and D'Angelo's liability.[3] The seminal Delaware corporate opportunity case—which all parties and the trial court recognize—is *Guth v. Loft. Inc.*, 5 A.2d 503, 510-11 (Del. 1939), in which the Delaware Supreme Court held that

> the rule of corporate opportunity, is merely one of the manifestations of the general rule that demands of an officer or director the utmost good faith in his relation to the corporation which he represents.
>
> It is true that when a business opportunity comes to a corporate officer or director in his individual capacity rather than in his official capacity, and the opportunity is one which, because of the nature of the enterprise, is not essential to his corporation, and is one in which it has no interest or expectancy, the officer or director is entitled to treat the opportunity as his own, and the corporation has no interest in it, if, of course, the officer or director has not wrongfully embarked the corporation's resources therein.

Whether a director of a corporation is duty bound to acquire a business opportunity for the corporation, or to refrain from acquiring the opportunity for himself, depends upon whether the corporation has an interest, actual or in expectancy, in the opportunity, or whether the acquisition of the opportunity by the director may hinder or defeat the plans and purposes of the corporation in the carrying on or development of the legitimate business for which it was created. *See Johnston v. Greene*, 121 A.2d 919, 923-24 (Del. 1956) (citing *Colorado & Utah Coal Co. v. Harris*, 97 Colo. 309, 49 P.2d 429 (Colo. 1935)). For the corporation to have an actual or expectant interest

---

[3] At trial, Appellants filed an unopposed Rule 202 Motion to Take Judicial Notice of Delaware Law. *See* TEX. R. EVID. 202. During oral argument in this court, the parties agreed Delaware law was applicable to the substantive issues.

in the opportunity, there must be some tie between the opportunity and the nature of the corporate business. *See id.* at 924.

In this case, there is a close tie between the nature of the Eagle Ford opportunity and the nature of Longview's business as an oil and gas exploration and production company. However, the inquiry does not end here. The next considerations are whether Longview had an interest, actual or in expectancy, in the Eagle Ford opportunity, or whether the purchase of the property by the director might hinder or defeat Longview's plans and purposes in the carrying on or development of the legitimate business for which it was created. *Id.* at 923-24. There is no dispute that Longview did not have an actual existing property right in the Eagle Ford opportunity. Therefore, as to the first consideration, the inquiry is narrowed to whether Longview had an *expectancy* in the opportunity.

Longview is an oil and gas exploration and production company. Eagle Ford is what is known as "a resource play or a source rock play," meaning it is the source of oil and gas. Longview had explored the Eagle Ford as an investment opportunity prior to the September 10, 2009 meeting with Bill Huff and Rick D'Angelo. Longview's vice president, David Fuller, testified Longview had been aware of Eagle Ford for many years and knew it could produce oil and gas, but at the time, it was not economically feasible to get the oil and gas out of the ground—that is, until technology changed, and horizontal drilling and fracking made production feasible. Fuller testified that in December 2009 the average price for Eagle Ford acreage was $1,000 per acre and, if Longview had been able to raise $40 million, Longview would have obtained roughly 40,000 acres.

Rick Pearce testified the planned proposal to the Longview board of directors was to acquire 3,000 acres in seven prospects, a total of 21,000 acres, at an estimated capital cost of $40 million. Pearce explained Longview needed acreage blocks large enough to drill horizontally, but

he did not want to purchase "one large chunk of acreage somewhere." Instead, he wanted to buy acreage spread across the "trend." Pearce explained "trend acreage" as "if a new trend has started —for instance, if somebody has found a new reservoir that will produce, one that hasn't produced in the past, then you try to get out in front of that. From your knowledge of regional geology, you try to predict best where that reservoir [is] or where the potential for that reservoir is going to be and you buy acreage out in front of it before it becomes a hot play and gets all leased up." Pearce testified Longview prepared two economic scenarios: one in which Longview purchased 100% of the 21,000 acres and then brought in an industry partner, and a second scenario in which Longview would begin with an industry partner and purchase the acreage on a fifty-fifty basis.

The land brokers with whom Longview worked indicated they had available land in the Eagle Ford trend, referred to as "blobs." When asked why the land brokers did not identify a specific lease or provide a specific property description, Pearce replied that unscrupulous people would take that information and contact the owner directly, thereby cutting the land broker out of the purchase. Pearce said he was comfortable that the land brokers could get specific property if Longview wanted to purchase acreage immediately. When asked if the brokers were offering Longview specific property, Pearce replied "Defined well enough within the fairways of the Eagle Ford, yes."

This evidence shows Longview wanted to invest in the Eagle Ford shale, spent time and money investigating investment opportunities in Eagle Ford property, and entered into discussions with land brokers about the availability of oil and gas property to acquire. But the question is whether these actions rise to the level of an "expectancy" in an opportunity. We conclude it does not. Instead, the evidence shows only that Longview had been, "in a general way, 'negotiating for and endeavoring to purchase' the interests involved." *Colorado & Utah Coal Co.*, 49 P.2d at 431.

One of the cases on which the *Guth* court relied for its holding that a corporate director may take an opportunity for his own if, among other things, the corporation had no interest or expectancy in the opportunity was *Colorado & Utah Coal Co.* In that case, the corporation was a coal company, and the suit was for the purpose of impressing a trust upon coal lands acquired by its president, who was also a director, in his individual capacity. There was evidence the corporation had investigated and considered these same coal properties, together with other coal properties. Nevertheless in holding that a corporate opportunity had not been established, the Colorado Supreme Court stated:

> . . . These parties are operating in a territory containing coal deposits of vast, we might almost say of unlimited, extent. Such is the condition of this record as to force the conclusion that, if plaintiff had an interest in expectancy in the property in question, it had a virtual monopoly of extensive fields into which its officers and directors were forever precluded from entering. We find in the authorities, and in reason, no support for such an extension of the doctrine of expectancy.

*Id.*

The same can be said here. The Eagle Ford shale encompasses millions of acres across thousands of miles. And, there is no dispute that the availability of land rapidly changed as other oil and gas companies also pursued Eagle Ford investment opportunities. The evidence is undisputed that Riley-Huff Energy began acquiring Eagle Ford property for itself as early as September 2009, which the trial court did not consider wrongfully obtained.[4] There is no dispute that Longview wanted to invest in the Eagle Ford shale. Longview claims its opportunity was "a concept [to] acquire 21,000 acres[,] which would be expanded to 'roughly 40,000 acres' . . . and then drill one well per tract to 'prove up' the leased area's oil-producing capability," "a proprietary strategy for investing in Eagle Ford," and an "interest in investing in a resource play." But, to

---

[4] The trial court expressly excluded from the constructive trust "those leases acquired by Riley-Huff pursuant to the 'BGE' transaction and the 'Maali' transaction, as set forth on exhibit B attached hereto and made a part hereof, and any associated wells, rights and other property interests."

characterize this concept, strategy, and interest in investing as an "expectancy" would give Longview "a virtual monopoly of extensive fields into which its officers and directors were forever precluded from entering." *Id.*

Also, an opportunity must be something more than a desire to invest—especially when the investment is in an area as large as the Eagle Ford shale. In *Johnston*, the Delaware Supreme Court addressed the chancellor's finding that a corporation's need for investments constituted an interest in the opportunity to acquire a specific business entity:

> . . . Now, this is an application of the rule of corporate opportunity that requires careful examination. It is one thing to say that a corporation with funds to invest has a general interest in investing those funds; it is quite another to say that such a corporation has a specific interest attaching in equity to any and every business opportunity that may come to any of its directors in his individual capacity. This is what the Chancellor appears to have held. Such a sweeping extension of the rule of corporate opportunity finds no support in the decisions and is, we think, unsound.

*Johnston*, 121 A.2d at 924.

Again, the same can be said here. There is no dispute Longview wanted to invest in the Eagle Ford and devoted extensive resources to developing an investment strategy. And, although we agree with Longview's argument on appeal that business opportunities "often consist of complex ideas, strategies, and transactions that can only be executed . . . over a period of time," the opportunity must be something more than a concept or strategy. To conclude Longview had an expectancy in a loosely-defined "strategy" would effectively preclude Longview's directors from investing in "any and every business opportunity that may" arise in the Eagle Ford shale. *Id.*

Finally, we must ask whether Riley-Huff Energy's purchase of the Eagle Ford property hindered or defeated Longview's plans and purposes. Both the Delaware Supreme Court in *Johnston* and the Colorado Supreme Court in *Colorado & Utah Coal Co.* held that one of the considerations in whether a corporate director is duty bound to refrain from purchasing property for himself depends upon whether the purchase of the property by the director may hinder or defeat

the plans and purposes of the corporation in the carrying on or development of the legitimate business for which it was created. *Johnston*, 121 A.2d at 923-24; *Colorado & Utah Coal Co.*, 49 P.2d at 430.

The same weakness that underscores Longview's arguments above applies here. Because Longview's own description of its opportunity is that it was a strategy or interest in investing "in a resource play," we do not believe Riley-Huff Energy's acquisition of acreage in the Eagle Ford hindered or defeated Longview's plan to also acquire acreage in the Eagle Ford. This is particularly true given the fact that the availability of Eagle Ford leases spread over millions of acres and thousands of miles, and several oil and gas companies other than Longview and Riley-Huff Energy were in competition for leases in the Eagle Ford.

For these reasons, we conclude the evidence is legally insufficient to support the jury's implied finding that Longview "had an interest or a reasonable expectancy in the opportunity." Because the evidence is legally insufficient to support one of the four implied findings the jury was required to make, the judgment cannot be affirmed on the grounds that Huff and D'Angelo failed to comply with their "fiduciary duty to Longview Energy Company by taking a corporate opportunity."[5]

### JURY QUESTION NUMBER TWO

The jury was next asked whether Bill Huff and Rick D'Angelo failed to comply with their fiduciary duty of loyalty to Longview Energy Company by engaging in competition with Longview without the informed approval of Longview's board of directors. The jury was instructed that a Longview "director fails to comply with his fiduciary duty of loyalty to

---

[5] Because we conclude the evidence is legally insufficient to support the first implied finding that Longview "had an interest or a reasonable expectancy in the opportunity," we do not address the sufficiency of the evidence in support of the remaining implied findings under jury question number one.

[Longview] if he engages in competition with [Longview] without the informed approval of [Longview's] board of directors." The jury answered "yes" as to both Huff and D'Angelo. On appeal, Huff and D'Angelo assert (1) under Delaware law, competition by itself will not independently support breach-of-fiduciary-duty liability and (2) Longview failed to plead a cause of action for competition separate from its usurpation of a corporate opportunity cause of action. We agree Longview did not plead a separate cause of action for competition; therefore, we do not address whether Delaware law supports such a cause of action. *See* TEX. R. APP. P. 47.1.

We review a trial court's decision to submit a jury question or instruction under an abuse of discretion standard. *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000). "A clear abuse of discretion exists when the trial court submits a jury question that is neither supported by the pleadings nor tried by consent." *Crowson v. Bowen*, 320 S.W.3d 486, 488 (Tex. App.—Fort Worth 2010, no pet.); *Stephanz v. Laird*, 846 S.W.2d 895, 902 (Tex. App.—Houston [1st Dist.] 1993, writ denied).

"Jury questions must be supported by the pleadings." *Webb v. Glenbrook Owners Ass'n, Inc.*, 298 S.W.3d 374, 380 (Tex. App.—Dallas 2009, no pet.); *see also* TEX. R. CIV. P. 278 ("The court shall submit the questions, instructions, and definitions in the form provided by Rule 277, which are raised by the written pleadings and the evidence."). "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." TEX. R. CIV. P. 67. However, "written pleadings, before the time of submission, shall be necessary to the submission of questions . . . ." *Id.*; *see also Gibbins v. Berlin*, 162 S.W.3d 335, 342 (Tex. App.—Fort Worth 2005, no pet.). Trial by consent does not occur where the complaining party properly objects to the submission of issues not raised by the pleadings. *Harkey v. Tex. Employers' Ins. Ass'n*, 146 Tex. 504, 509, 208 S.W.2d 919, 922 (1948). "Certainly issues are not tried merely by the hearing of the testimony thereon; submission to the jury undoubtedly is part of the process. So, although the complaining party does

not object to the testimony on the issues but does object to their submission on some tenable ground, he cannot be regarded as impliedly consenting that they be tried when not raised by the pleadings, as contemplated by Rule 67." *Id.* In this case, appellants objected to the submission of jury question number two on the ground that it was not supported by the pleadings; therefore, the issue was not tried by consent.

There is no contention by Longview that it expressly or specifically stated in its last live petition that it was raising a "competition" claim. Instead, Longview asserts it pled the claim because "competition" was a "pervasive theme" in its petition. A pleading should contain "a short statement of the cause of action sufficient to give fair notice of the claim involved . . . ." TEX. R. CIV. P. 47(a). When, as here, special exceptions are not filed, we construe the petition liberally in favor of the pleader. *Roark v. Allen*, 633 S.W.2d 804, 809 (Tex. 1982). We will uphold the petition as to a cause of action that may be reasonably inferred from what is specifically stated, even if an element of the cause of action is not specifically alleged. *See id.* In determining whether a pleading is adequate, we examine whether an opposing attorney of reasonable competence, on review of the pleadings, can ascertain the nature and the basic issues of the controversy. *Bowen v. Robinson*, 227 S.W.3d 86, 91 (Tex. App.—Houston [1st Dist.] 2006, pet. denied).

To determine whether Longview's petition gave fair notice of a breach of fiduciary duty by competition claim, we turn first to the "Factual Background" section of the petition. In the "Relationship of the Parties" subsection of the petition, Longview contended that three of the defendants—D'Angelo, Dartley, and Bloom—held positions with HEF portfolio companies that were "direct competitors of Longview," one of which was Riley-Huff Energy. Longview characterized Riley-Huff Energy as a "direct competitor of Longview." In the "The Scheme and Its Roots" subsection, Longview stated as follows:

Longview diligently educated its Directors concerning their duties of loyalty to the company. These duties demand absolute fidelity to Longview's interests and require an extra measure of diligence when a director may have divided interests by, for instance, simultaneously serving as a director, officer, partner, investor or manager of entities *in competition with Longview*. Accordingly, in 2007, Longview distributed a guidance letter prepared by its corporate counsel [that] cautioned "*[i]f an investor opposes or favors, out of its own economic self-interest and not necessarily that of the corporation, an action being considered by the corporation, it should express that position in its capacity as a stockholder of the corporation . . .* and not as a director." [Emphasis added.]

Longview next referred to a letter sent on the eve of the January 28 board meeting from

WRH Energy to Longview, which

did not disclose that the Huff parties had decided to pursue Eagle Ford opportunities through Riley-Huff and its other portfolio companies rather than Longview, nor that it already had negotiated a contract with Ford's company, Wyldfire. *Accordingly, the letter is plainly a pretext designed to obscure the decision to hijack Longview's valuable Eagle Ford opportunity.* Moreover, the inherent conflict ignored by Huff and his minions was that—although their control of multiple portfolio companies in the energy sector allowed them the luxury of covering losses in many of these companies with a bonanza in one company—Longview rises and falls according to its individual performance. In other words, Longview had duties to all its shareholders, not just to Huff Energy; it made a great difference to those Longview shareholders whether an Eagle Ford payday wound up in Longview rather than inside another Huff portfolio company. [Emphasis added.]

Longview next alleged:

Soon after execution of its January 25, 2010 agreement with Wyldfire, Huff Energy's majority-owned portfolio companies embarked on an ambitious investment program in the Eagle Ford acres previously presented to Longview, ultimately pouring millions of dollars into lease acquisitions and drilling wells on these very properties. *Riley-Huff ultimately acquired through Wyldfire thousands of acres first identified and targeted by Longview and it obtained tens of thousands of acres from other sources. Contrary to their fiduciary duties to Longview, neither Huff nor D'Angelo ever presented these opportunities to Longview or its Board.* [Emphasis added.]

Finally, Longview alleged that

[b]y as early as April 2010, Huff Energy had dumped almost $40 million into Riley-Huff's Eagle Ford play, which—by no coincidence—was exactly what Longview had proposed to do only weeks earlier to its Board (and to Huff and D'Angelo as Directors). *Huff Energy took this investment tack for its own benefit* because it would reap nearly 100% of the value from investments made through its

majority owned and controlled companies, whereas it would gain only a fraction of any profits from an investment made through independently owned and managed Longview. *This, of course, flatly contravened Huff and D'Angelo's strict duty of loyalty to Longview, which prohibited them from exploiting business opportunities that fairly belonged to Longview and required them to present such opportunities to Longview before exploiting them for their own self-interests. Their usurpation is all the more egregious because Huff and D'Angelo (aided by their cohorts) acted under the cloak of their directorships* and acted not only surreptitiously but implemented their scheme through the misuse of confidential, proprietary corporate information supplied by Longview. . . . . [Emphasis added.]

The next section of the petition stated the "Claims" asserted by Longview. Under the claim entitled "Breach of Fiduciary Duty/Usurpation of Corporate Opportunity (Against Huff and D'Angelo)," Longview alleged

55. D'Angelo and Huff owe Longview a duty of loyalty.
56. Longview was financially able to exploit the Eagle Ford opportunity.
57. The Eagle Ford opportunity was within Longview's line of business.
58. Longview had an interest or expectancy in the Eagle Ford opportunity.
59. *By diverting the Eagle Ford opportunity to themselves, D'Angelo and Huff placed themselves in a position of conflict or competition with Longview.*
60. D'Angelo and Huff breached their fiduciary duties to Longview by usurping the Eagle Ford opportunity and misusing proprietary information supplied by Longview in regard to the Eagle Ford. . . . . [Emphasis added.]

This "Breach of Fiduciary Duty/Usurpation of Corporate Opportunity (Against Huff and D'Angelo)," section set forth the same elements the jury later considered in jury question number one instructing the jury when a Longview director "may *not* take a corporate opportunity for himself."

The petition also included specific "Claims" subsections for "Fraud," "Tortious Interference with Prospective Business Relationships," "Misappropriation of Trade Secrets," "Aiding and Abetting," and "Conspiracy." However, as we have already noted, although there was a specific "Claims" subsection for breach of fiduciary duty based on usurpation of corporate opportunity, there was no specific "Claims" subsection for breach of fiduciary duty based on unapproved competition.

After reading the petition in its entirety and construing the petition liberally in favor of Longview, we conclude the petition did not give fair notice to appellants of a separate competition claim. It is true the petition characterized Riley-Huff Energy as a competitor of Longview and contended Longview educated its directors on their duty of loyalty especially when the director served in a position with another entity that competed with Longview. But, any reference to competition was in connection with its claim of usurpation. The factual allegations spoke in terms of a director considering or appropriating an opportunity that belonged to Longview: (1) what a director should do when the director favored "an action being considered by the corporation"; (2) the WRH letter did not disclose that "the Huff parties had decided to pursue Eagle Ford opportunities through Riley-Huff and its other portfolio companies rather than Longview" and the letter was a "pretext designed to obscure the decision to hijack Longview's valuable Eagle Ford opportunity"; (3) "Riley-Huff ultimately acquired through Wyldfire thousands of acres first identified and targeted by Longview . . . [and] neither Huff nor D'Angelo ever presented these opportunities to Longview or its Board"; and (4) HEF's actions "contravened Huff and D'Angelo's strict duty of loyalty to Longview, which prohibited them from exploiting business opportunities that fairly belonged to Longview."

We also note that Longview's "theme" of appropriating an opportunity was carried through to the remaining claims expressly asserted by Longview. Under the "Fraud" claim, Longview alleged (1) "D'Angelo and Huff concealed from Longview their intentions to appropriate the Eagle Ford opportunity for themselves and affirmatively misrepresented that Huff intended to fund an Eagle Ford investment through Longview"; (2) Longview did not know D'Angelo and Huff "would appropriate the very business opportunity they had encouraged and induced Longview to pursue"; (3) D'Angelo and Huff "went to great lengths to fraudulently conceal their ultimate design to appropriate the Eagle Ford opportunity for themselves"; (4) by "concealing and

- 18 -

facilitating the scheme to appropriate the Eagle Ford opportunity, [the defendants] intended to cause Longview to: (a) use its own resources to develop the information necessary to make an investment in the Eagle Ford; and (b) refrain from pursuing alternative means for exploiting the Eagle Ford opportunity"; and (5) Longview "reasonably believed that: (a) D'Angelo and Huff did not intend to appropriate the Eagle Ford opportunity for themselves."

Under the "Tortious Interference with Prospective Business Relations" claim, Longview alleged the "defendants intentionally interfered with this prospective relationship [with the land brokers] by appropriating the Eagle Ford opportunity for themselves." Longview's petition also contained a paragraph entitled "Constructive Trust," which stated as follows:

> The defendants wrongfully usurped the Eagle Ford opportunity, and they were unjustly enriched by their wrongful conduct. Specifically, the defendants unjustly obtained thousands of acres of leases in the Eagle Ford that fairly belong to Longview. *Accordingly, Longview is entitled to a constructive trust over all the subject leases in the defendants' possession or on any assets that the defendants obtained by virtue of the usurpation.* [Emphasis added.]

Under a section entitled "Maximum Amount of Damages Claimed," Longview alleged "[t]he defendants stole Longview's opportunity to invest in the Eagle Ford by breaching their fiduciary duties, defrauding Longview, and misappropriating Longview's trade secrets."

If we cannot reasonably infer that the petition contains a claim, then we must conclude the petition does not contain this claim, even under our liberal construction. *See SmithKline Beecham Corp. v. Doe*, 903 S.W.2d 347, 354-55 (Tex. 1995). Here, general allegations referring to an entity as a competitor of Longview did not implicate a cause of action based on competition. The facts alleged by Longview in conjunction with the wording of the claims expressly pled, leads us to the conclusion that the petition did not assert a separate competition claim that could reasonably be inferred from the specific language used in the petition.

When a plaintiff's petition omits an element of a cause of action or fails to state it with sufficient clarity to inform the defendant of the nature of the suit, a defendant must specially except to the plaintiff's pleadings. *Crabtree v. Ray Richey & Co.*, 682 S.W.2d 727, 728 (Tex. App.—Fort Worth 1985, no writ). On the other hand, when a plaintiff pleads none of the elements of a viable cause of action, the defendant is not obligated to file special exceptions that would suggest to the plaintiff possible causes of action against the defendant. Here, because we conclude a competition cause of action could not be reasonably inferred from what was specifically stated in Longview's petition, appellants were not required to file special exceptions that would suggest to Longview all possible causes of action that could be filed against them.

For these reasons, we conclude the trial court erred when it submitted question number two to the jury. Therefore, we next consider whether the error was harmful. We will reverse the trial court's judgment only if the charge error was harmful, meaning it probably caused the rendition of an improper verdict. *Wackenhut Corp. v. Gutierrez*, 453 S.W.3d 917, 921 (Tex. 2015); TEX. R. APP. P. 44.1(a)(1). Submission of an improper jury question may be harmless when an appellate court determines the verdict was based on a valid theory of liability. *Gilbert Wheeler, Inc. v. Enbridge Pipelines (E. Texas), L.P.*, 449 S.W.3d 474, 486 (Tex. 2014); *Thota v. Young*, 366 S.W.3d 678, 693-94 (Tex. 2012).

In this case, Longview did not submit to the jury its claims for fraud, tortious interference with prospective business relationships, misappropriation of trade secrets, and conspiracy. Therefore, the only basis for liability against any of the appellants is that Huff and D'Angelo breached their fiduciary duty to Longview. Only jury questions one and two addressed whether Huff and D'Angelo breached their fiduciary duty, and all other findings flowed from the jury's affirmative finding on at least one of those questions. As explained above, we conclude the evidence is legally insufficient to support the jury's finding under question number one that Huff

and D'Angelo failed to comply with their fiduciary duty to Longview "by taking a corporate opportunity," and the judgment cannot be affirmed on that basis. Therefore, the only remaining theory of liability for breach of fiduciary duty was the competition cause of action. Because we have concluded the verdict was based, in part, on the corporate opportunity theory of liability for which the evidence is legally insufficient, submission of the improper jury question on the remaining competition theory of liability was harmful because the jury found Huff and D'Angelo liable under this theory. Therefore, the judgment cannot be affirmed on the grounds that Huff and D'Angelo failed to comply with their fiduciary duty of loyalty to Longview by engaging "in competition with [Longview] without the informed approval of [Longview's] board of directors."

## LIS PENDENS

Finally, appellants contend that if the judgment is reversed, this court should expunge any notices of *lis pendens* filed by Longview under Texas Property Code section 12.0071(c)(2). *See* TEX. PROP. CODE ANN. § 12.0071(c)(2) (West 2014). Section 12.0071(c) provides that a court shall order a notice of *lis pendens* expunged if that court determines "the claimant fails to establish by a preponderance of the evidence the probable validity of the real property claim." *Id.* § 12.0071(c)(2). Longview, however, claims this requested relief should be brought before the trial court. We agree.

It does not appear this court has jurisdiction to remove a notice of *lis pendens*. *See In re Estate of Sanchez*, No. 04-11-00332-CV, 2012 WL 1364979, *7 (Tex. App.—San Antonio Apr. 18, 2012, pet. denied) (mem. op.) (stating "Section 12.0071 allows a party to file a motion requesting *the trial court* expunge a notice [of] *lis pendens*." (emphasis added)). Further, this court has not been provided any authority demonstrating this court's jurisdiction to remove a notice of *lis pendens*. Accordingly, we decline to issue any orders, as requested by appellants, to expunge the notices.

**CONCLUSION**

For the reasons stated above, we conclude the evidence is legally insufficient to support the jury's finding on the corporate opportunity question and we conclude Longview did not plead a competition cause of action. Therefore, we reverse the trial court's judgment and render a take-nothing judgment in favor of appellants.[6]

Sandee Bryan Marion, Chief Justice

---

[6] Because our disposition of the issues addressed in this opinion are dispositive of the appeal, we do not address appellants' remaining issues on appeal. TEX. R. APP. P. 47.1.